NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1183n.06

No. 11-1523

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Nov 20, 2012*

DEBORAH S. HUNT, Clerk

SUETTA SMITH, as Personal Representative of the )
Estate of Brenda Sue Smith, Deceased, )
)
      **Plaintiff-Appellee.** )
)
v. )
)
COUNTY OF LENAWEE; PAUL DYE, Sgt.; J. )
CRAIG, Sgt.; WENDY VANDERPOOL, Officer; )
BENNICE BAKER; ADAM ONDROVICK, Officer; )
ERIC WESTGATE, )
)
      **Defendants-Appellants.** )

**ON APPEAL** FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

**O P I N I O N**

BEFORE: **BOGGS, NORRIS and KETHLEDGE, Circuit Judges**.

**ALAN E. NORRIS, Circuit Judge.** Plaintiff Suetta Smith filed suit on behalf of her

deceased daughter Brenda Smith, who died while incarcerated in the Lenawee County, Michigan jail.

Smith was taken into custody for a parole violation on Friday, April 27, 2007. The following

Monday morning she died of a seizure brought on by *delirium tremens*. The two-count amended

complaint alleges deliberate indifference to her serious medical needs in violation of 42 U.S.C.

§ 1983 and gross negligence under Michigan law. The amended complaint names the County, the

sheriff, the off-site doctor in charge of medical care, and various jail employees as defendants. The

district court denied summary judgment to all but two of the named defendants. With the exception

of the doctor, they appeal that denial. We affirm in part and reverse in part.

**I.**

Smith arrived at the Lenawee County Jail at approximately 5 p.m. on Friday, April 27, 2007. The daytime shift supervisor, Sergeant Mary Neill, frisked her on arrival. That evening Neill spoke with the jail's medical director, Dr. Jeffrey Stickney, by telephone. Neill told him, "She says she drinks everyday, she's an alcoholic. Um, she's shaking really bad." He responded by saying that "I'll order some stuff tomorrow."

At the time of her arrival, Smith, who was 37, was taking high blood pressure medication and Dilantin, an anti-epileptic drug to control seizures that had begun some six months earlier. Dr. Stickney prescribed Librium after speaking with Neill. Smith took her first dose at 9:35 that evening. Neill noted in a "pass-on" sheet that it was ordered for "alcohol withdrawal."

Sergeant Paul Dye took over as shift commander at 7 p.m. on Friday and worked until 7 the following morning. He noted that Smith was suffering from "DTs" in a pass-on sheet. That evening Smith spoke to her mother, Suetta Smith, and told her "I better get some medical attention here because I'm going to go through withdrawals. I'm already shaking like a leaf."

At 7 a.m. on Saturday morning, Sergeant Neill relieved Dye. Dye returned that evening for the overnight shift. At 3:30 on Sunday morning, Dye noted that Smith was exhibiting "paranoid behavior and irrational actions." She was singing, pounding on the walls, and talking to relatives who were not present.

As the day progressed, Adam Ondrovick, an intake officer, saw her speaking to people who did not exist. He was replaced at 7 p.m. by intake officer Wendy Vanderpool. In her deposition,

Vanderpool recalled that Smith was "agitated, talking about things in her life as if she was there and then she was back, you know, in the jail."

Sergeant Dye was also on duty Sunday night and stayed until 3 a.m. on Monday morning. He moved Smith to a padded observation cell. He called Dr. Stickney at 9:26 p.m. and told him that she was "to the point of really bad hallucinations right now." Dye reported that Smith had not eaten lunch, was "getting kind of violent about wanting to get out of her cell," and was generally agitated. Stickney replied that "she's on good medicine" and that he would have the part-time jail nurse examine Smith the following day. Stickney also said, "Sitting in the jail will do her some good."

Wendy Vanderpool was on duty from 7 p.m. on Sunday until Smith died at ten on the following morning. At her deposition, Vanderpool testified that Smith was "sweaty from holding that wall up." In other words, Smith was so delusional that she thought that the wall would fall down without her. Vanderpool affirmed that Smith was in a padded observation cell. By 5 a.m. on Monday, she noted that Smith was "getting more settled." She was "on the floor playing with puppy dogs and playing with bugs."

At 7 a.m. Sergeant Craig took over as shift commander. After Smith's death Detective David Seeburger prepared a death investigation report, which included a timeline of Smith's final hours based upon a videotape of the cell. According to this timeline, at 8:46 a.m. Smith was on her buttocks and knees with her upper torso resting on the cell's bench. A minute later, Craig entered the cell and set a cup of water near Smith, which she did not touch. He looked at her but left the cell seconds later. At that point, Smith was "still moving her hands and feet and head occasionally."

Craig told Vanderpool to monitor Smith every fifteen minutes. Vanderpool was assisted by intake officer Bennice Baker who started her first day of work at the jail that morning.

Around 9 a.m., officer Thomas Moore[1] arrived to serve Smith with her parole violation notice. However, he was unable to do so because of Smith's condition. The videotape of Smith's cell reveals that she last moved at 9:19 a.m. At 9:50 a.m., corrections officers entered the cell, observed that Smith was not breathing, and summoned help. Paramedics arrived five minutes later and transported her to the hospital where she was pronounced dead at 11:22 a.m.

As the district court recognized, the liability of each individual defendant must be analyzed separately. *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 542 (6th Cir. 2008). Additional facts will be discussed in the context of those analyses, including the roles played by defendants Eric Westgate and Adam Ondrovick whom we have no mentioned in this brief factual recitation.

**II.**

A. Jurisdiction

For purposes of appeal, the district court's rulings on both qualified immunity under federal law and governmental immunity under Michigan law constitute final appealable orders. *Smith*, 600 F.3d at 689-90. We recognize that while the purely legal issue of qualified immunity is immediately appealable under 28 U.S.C. § 1291, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), we lack jurisdiction when the district court bases its denial of qualified immunity on "a 'genuine' issue of

---

1. The district court granted qualified immunity to Officer Moore on the deliberate indifference claim but denied him summary judgment on the gross negligence claim. On appeal, we affirmed the former judgment and reversed the denial of summary judgment on the gross negligence claim. *Smith v. Cnty. of Lenawee*, 600 F.3d 686 (6th Cir. 2010).

fact for trial." *Sabo v. City of Mentor*, 657 F.3d 332, 335-36 (6th Cir. 2011) (quoting *Johnson v. Jones*, 515 U.S. 304, 319 (1995)). In its opinion, the district court observed, "[t]he qualified immunity issue in this case is fact-bound." Nevertheless, "we have jurisdiction to consider an appeal from a denial of qualified immunity if the defendant does not dispute the facts alleged by the plaintiff for purposes of the appeal." *Bishop v. Hackel*, 636 F.3d 757, 764 (6th Cir. 2011). Put differently, defendant must concede the most favorable view of the facts to plaintiff to get past the jurisdictional hurdle of *Johnson*. *Id.* at 764-65. We keep this precept in mind when assessing whether the facts support a grant of qualified immunity.

B.  Qualified Immunity

Government officials are immune from civil liability under 42 U.S.C. § 1983 when performing discretionary duties, provided "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We apply a two-pronged test to determine whether qualified immunity shields a government official from a § 1983 claim: (1) we inquire whether the facts, viewed in the light most favorable to the nonmoving party, "show the officer's conduct violated a constitutional right;" and (2) if so, then we determine whether the constitutional right was clearly established by asking whether "a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *abrogated in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We review a district court's denial of summary judgment based upon the defense of qualified immunity de novo. *Bishop*, 636 F.3d at 765.

C. Deliberate Indifference

While a claim of deliberate indifference to the serious medical needs of an inmate falls under the protection of the Eighth Amendment, that amendment does not apply to pretrial detainees like plaintiff Smith. In those cases, our analysis is essentially the same but falls under the Fourteenth Amendment. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001) (under the Fourteenth Amendment's Due Process Clause pretrial detainees have a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners).

The contours of an deliberate indifference claim are as follows:

> The Eighth Amendment forbids prison officials from unnecessarily and wantonly inflicting pain" on an inmate by acting with deliberate indifference toward the inmate's serious medical needs. . . . Whether a convicted prisoner or a pretrial detainee, deliberate indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983. Prison officials' deliberate indifference violates these rights [w]hen the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care . . . for a serious medical need.

> A constitutional claim for denial of medical care has objective and subjective components. The objective component requires the existence of a sufficiently serious medical need. . . . The inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.

> The subjective component requires an inmate to show that prison officials have a sufficiently culpable state of mind in denying medical care. This subjective component should be determined in light of the prison authorities' current attitudes and conduct. Deliberate indifference entails something more than mere negligence, but can be satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. [T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference.

*Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895-96 (6th Cir. 2004) (citations omitted and punctuation altered).

Germane to this appeal is the following observation: "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976); *see Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (citing *Westlake* with approval). Furthermore, "[i]f a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.*

D. The Individual Defendants

We now turn to the deliberate indifference claim lodged against each of the individual defendants, recognizing that their entitlement to qualified immunity rests on the role each of them played in the circumstances surrounding Brenda Smith's death.

1. Sergeant Dye

Dye's first encounter with Smith came at 7 p.m. on Friday, some two hours after she was taken into custody. He worked the overnight shift, leaving at 7 on Saturday morning. He received Sergeant Neill's pass-on sheet, which noted that Smith had "meds ordered for alcohol withdrawal." When finishing his shift, Dye's only notation with respect to Smith was "DT's."

Dye also worked the overnight shift beginning Saturday evening and concluding Sunday morning. According to an incident report he prepared, that evening he observed that Smith began to "experience paranoid behavior and irrational actions," which included singing and pounding the walls. However, he also noted that "she appeared to be in good spirits and functioning well physically."

Dye was again on duty from 7 p.m. Sunday evening until 3 a.m. on Monday morning. Shortly before 9 p.m., he moved Smith into a padded observation cell. According to his deposition testimony, he did so because he was worried that Smith might harm herself accidentally. Soon thereafter, he spoke with Dr. Stickney. Stickney testified that he told Dye he would have the nurse look at Smith the following day. Dye's pass-on sheet for that evening states, "Brenda Smith is very ill w/DT an[d] w/d symptoms. Dr. Stickney was called." He also wrote an incident report which states that Dr. Stickney told him that "it sounded like she was on good medication and to keep her safe and watch her."

Dye points out that plaintiff's expert, Dr. Joseph Goldenson, conceded that he believed that Dye adequately informed Dr. Stickney of Smith's deteriorating condition, that it was appropriate for Dye to follow Dr. Stickney's medical orders, and that placing Smith in a padded cell was a safe alternative for someone going through alcohol withdrawal.

Dye clocked out at 3 a.m. on Monday morning and had no further contact with Smith before she died several hours later. He takes the view that his responsibility was to consult with the doctor as needed, which he did, follow that advice, and take measures in response to any deterioration of Smith's condition.

The district court reached a different conclusion. It focused on the fact that Dye understood the seriousness of *delirium tremens* and that it was on his watch that "Smith's DTs took a harsh turn for the worse." In the court's view, consulting with Dr. Stickney was not Dye's only recourse. The Jail Policy states that "[i]f at any time during contact with an Offender Inmate an employee identifies an injury or need for medical attention, the Jail Shift Commander will be notified and medical treatment will be provided. Emergency treatment will be provided at Bixby Hospital." The court concluded, "The evidence supports a conclusion that Dye violated Smith's clearly established constitutional rights by disregarding a known risk of serious harm to Smith and taking no action to contact emergency medical services on April 29, 2007."

We respectfully disagree. Even if we view the facts, as we must, in a light most favorable to plaintiff, Sergeant Dye is entitled to summary judgment based upon qualified immunity. There is no question that plaintiff established the objective component of her deliberate indifference claim, *i.e.*, that a serious medical need existed. Defendants, and Sergeant Dye in particular, recognized that Smith was suffering from *delirium tremens*. However, "[d]eliberate indifference is not mere negligence." *Watkins*, 273 F.3d at 686. To meet the subjective component of her claim, plaintiff must establish that Dye had a sufficiently culpable state of mind in denying or delaying medical care. *Blackmore*, 390 F.3d at 895 (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). In retrospect, Dye should have summoned an ambulance. He did not exhibit deliberate indifference to Smith's plight, however. He took her to an observation cell for her own protection and called Dr. Stickney who assured him that she was on "good medicine" and advised that he would have the nurse see her in the morning. As the Third Circuit has said, "[A]bsent a reason to believe (or actual

- 9 -

knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill*, 372 F.3d at 236. As the Supreme Court has stated, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference.*" *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added). Dr. Stickney assured Sergeant Dye that Smith was on proper medication and that being held in the jail at that juncture would do her good. Under the circumstances, therefore, it is understandable that Sergeant Dye did not draw the inference that Smith was at substantial risk of serious harm even though he recognized that she was suffering from *delirium tremens*. For these reasons, we reverse the denial of summary judgment as to this defendant.

### 2. Officer Westgate

Defendant Eric Westgate had limited exposure to Smith's situation. On Sunday evening he was working on the floor above before taking over as shift commander for Sergeant Dye at 3 a.m. on Monday and he remained on duty until 7 a.m. when Sergeant James Craig took over for him.

According to Westgate's deposition testimony, he read Sergeant Dye's incident report about Smith that detailed his conversation with Dr. Stickney. He also prepared an incident report that noted Smith's failure to eat breakfast or to drink anything that morning. He observed that she had not slept and "was yelling at her relatives all night and morning." The report recommended a follow-up by medical personnel. He testified that it was obvious to him that she needed to be seen by a doctor. He also conceded that he could not recall whether he told Sergeant Craig that Smith needed to be seen by the nurse and he did not call Dr. Stickney.

The district court focused upon Westgate's statement that he realized Smith needed to be seen by a doctor and yet failed to contact one:

> Westgate appreciated that DT could be a serious condition and could be lethal. It was also within his undisputed authority to contact emergency personnel. . . . A jury could conclude that Westgate's delay in providing medical care to Smith under the circumstances could constitute deliberate indifference.

In our view, Sergeant Westgate is entitled to qualified immunity for essentially the same reasons that we reach that result with respect to Sergeant Dye. First, he had only a four-hour exposure to Smith. Second, he documented his concern about her not eating in an incident report that was placed in the nurse's inbox, which Sergeant Craig, another shift supervisor, testified was the appropriate routine. Third, he had read Dye's incident report concerning his conversation with Dr. Stickney and was therefore aware that the doctor felt that Smith's continued presence in the jail was appropriate. In short, like Dye, his failure to obtain more timely medical intervention for Smith is deeply regrettable with the benefit of hindsight, but it does not amount to deliberate indifference.

### 3. Sergeant James Craig

Sergeant Craig took over as shift commander on Monday at 7 a.m., just a few hours before Smith died. He reviewed the pass-on sheets and incident reports from the weekend and spoke with Westgate. In his deposition, he testified that he recalled being informed that Smith was suffering from *delirium tremens* and that Dr. Stickney had prescribed medication.

Craig asked intake officer Wendy Vanderpool keep an eye on Smith. As described earlier, the cell videotape reveals that Smith was on her buttocks and knees with her torso thrown on her bunk when Craig briefly entered the cell and set a cup of water near her. Vanderpool turned on the

microphone to monitor the sound in Smith's cell and checked her visually every fifteen minutes. She was assisted by defendant Bennice Baker who had just started her first day of work. Baker watched Smith for about thirty minutes.

Sometime before 10 a.m., Craig asked Baker into his office for an orientation interview. Not long thereafter, Vanderpool called for help because Smith had lost consciousness. Officers used a defibrillator to try to revive Smith and called EMS.

In Craig's view, he reasonably responded to Smith's medical needs by ordering that she be monitored. He also knew that she was receiving medications for her medical problems and that she had been resting more quietly over the past few hours than she had during the previous day. He analogizes his situation to that described in *Harrison v. Ash*, 539 F.3d 510, 519 (6th Cir. 2008), where we held that jail officers were not deliberately indifferent to the serious medical needs of an inmate with asthma because they monitored and, belatedly, summoned medical aid. Despite these efforts, the inmate died.

The district court disagreed and offered this analysis:

> Sergeant Craig's first and only personal encounter with the decedent occurred around 8:46 a.m. After Officer Vanderpool told Craig that Smith was holding onto her empty cup, Craig went into the cell, took her cup, filled it with water, and brought it back a minute later. He found Smith "on her knees and maybe on her elbows" on the floor by the bench-type elevation. Although Craig testified that he "asked her how she was doing," in response to which she "did say something that was inaudible," the video recording of the cell suggests otherwise. Smith is seen sprawled out on the floor by the elevated bench and not reacting to Craig's presence. Although the video does not contain a sound track, Craig is seen getting in and out of Smith's cell both times very quickly, briskly putting the cup with water by Smith's body the second time, and not checking Smith's vital signs or focusing his eyes on her. By the time of his visit, Smith could only slightly twitch her hands. At that point, Smith was a mere half an hour away from her last movement.

The court also cites Craig's deposition testimony that Smith was sweating profusely and had been suffering *delirium tremens* throughout the night. Because he was aware of the seriousness of Smith's medical situation and failed to address it (and instead met with Officer Baker), the court denied summary judgment based upon qualified immunity.

Sergeant Craig's entitlement to qualified immunity presents a close question. Like his fellow officers, he was aware of Smith's situation but likewise knew that she was on medication and in a "safe" environment. What distinguishes his situation from those of defendants Dye and Westgate, however, is that he encountered Smith in her last hour, at a time when she was unresponsive and sweating profusely. He was on notice that she was very ill and yet did nothing to make sure that Smith had not taken a turn for the worse. Rather than ascertain her condition, he left the cell in after only a minute to meet with his new intake officer. Viewing these facts in a light most favorable to plaintiff, we agree with the district court's conclusion that Craig is not entitled to qualified immunity.

### 4. Officer Bennice Baker

Officer Baker arrived for her very first day of work at 7 a.m. on Monday, April 30th, just three hours before EMS was summoned for Smith. She was asked to help monitor Smith by Officer Vanderpool. She did so for approximately thirty minutes. The district court thought that, because Baker had been trained to distinguish the symptoms of both alcohol withdrawal and *delirium tremens*, she should have recognized the seriousness of Smith's condition and denied her qualified immunity. It noted, however, that hers was a close case.

We agree but believe that the balance tips in favor of qualified immunity with respect to Baker. Notably, it was her first day on the job. She arrived and was provided a task by two more

experienced colleagues: Vanderpool and Craig. She did what was asked of her. Admittedly, she failed to detect the seriousness of Smith's condition, but she lacked the background information about Smith that Sergeant Craig and Officer Vanderpool had. After thirty minutes of observation, she was summoned by Sergeant Craig for an orientation session. Even when we view the facts in a light most favorable to plaintiff, we are unable to conclude that they establish the subjective component required to prevail on a claim of deliberate indifference. To do so would require us to conclude that Baker actually inferred that a substantial risk of serious harm existed. *Farmer*, 511 U.S. at 837. We decline to do that. It was her first day on the job, she observed Smith for only thirty minutes, and did not have nearly as much knowledge about the medical situation as did her colleagues. As we explained earlier, "deliberate indifference 'entails something more than mere negligence.'" *Blackmore*, 390 F.3d at 895 (quoting *Farmer*, 511 U.S. at 835).

5. Officer Adam Ondrovick

Officer Ondrovick booked Smith when she arrived at the jail on Friday. He also saw her during the day shifts on Saturday and Sunday. As with Baker, the district court recognized his as a "close case." However, it pointed out that Ondrovick observed Smith talking to herself on Sunday and recognized that she was experiencing some form of alcohol withdrawal.

In his deposition, Ondrovick stated that he did not know specifically what *delirium tremens* was but he recognized that Smith was going through alcohol withdrawal. He contends that he was attentive to Smith's needs by alerting Sergeant Neill (to whom the district court granted qualified immunity) to the fact that Smith was on seizure medication. Further, he was not present when her condition began to deteriorate seriously on Sunday evening. In short, his contention is that he was

unable to draw the inference that Smith was in a serious medical state and therefore he could not have acted with deliberate indifference towards her.

We are of a like mind. Officer Ondrovick was not present when Smith's condition to took a desperate turn and, while he observed her suffering from alcohol withdrawal, he had reason to assume that her condition was being treated. More importantly, he performed his duties. That he did not take the extra step of bringing the need for more aggressive intervention to his superiors, that failure at most – and we doubt even this – amounts only to negligence. Accordingly, we hold that Officer Ondrovick is entitled to summary judgment based upon qualified immunity.

6. Officer Wendy Vanderpool

In denying her qualified immunity, the district court observed that Officer Vanderpool monitored Smith for the longest period: from 7 p.m. on Sunday until her death the following morning. She also had worked as an emergency medical technician for fourteen years. It concluded that she should have recognized the peril Smith was in:

> Although Vanderpool denies that she had realized that Smith needed to see a doctor, she was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," *Farmer*, 511 U.S. at 837, and a jury could conclude that she in fact drew that inference. For example, Vanderpool realized that Smith needed to have fluid intake, and even recruited Officer Baker to help her monitor Smith. Add to this situation Vanderpool's failure to check on Smith for a forty-minute period between [parole officer ] Moore's visit and the discovery that Smith did not breathe–in violation of Policy 4.1.1 requiring physical monitoring of special needs inmates at least once every fifteen minutes–and a jury could find that Vanderpool was deliberately indifferent to Smith's serious medical condition.

Officer Vanderpool contends that she monitored Smith through the window of the cell door. Moreover, she knew that Smith was on medication prescribed by Dr. Stickney and she saw no need to second guess his judgment.

Once again, her case represents an extremely close call, but, as with Sergeant Craig, our duty to construe the facts in a light most favorable to plaintiff compels us to affirm the denial of qualified immunity. Officer Vanderpool, like Sergeant Craig, was present when Smith died. Her exposure to Smith's condition, her experience, and her inadequate monitoring of a detainee whom she knew to be in dire condition are enough to allow the claim of deliberate indifference to go to a jury.

E. The County's Liability

The district court concluded that the record "establishes a genuine issue of material fact as to Lenawee County's liability for deliberate indifference." While the County did not have a written policy that violated Smith's constitutional rights, she can prevail if she establishes that it had a clear and persistent pattern of such violations. *See Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008). The custom "'must be the moving force of the constitutional violation' to establish the liability of the government body." *Id.* (quoting *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981)). The district court looked to *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-91 (1989), for the proposition that a municipality may be held liable for failure to train its employees if that failure amounts to deliberate indifference to the rights of the persons with whom the municipality's employees come into contact. However, that failure to train must also have actually caused the employees' indifference to the plaintiff's medical needs. *See Blackmore*, 390 F.3d at 900 (finding

liability where the seriousness of prisoner's medical need was obvious and the county lacked policy, practices, and adequate training).

The district court considered the employment contract between the County and Dr. Stickney. One of its provisions was that he would collaborate with the County jail's public health nurse to develop policies that would manage "specific health problems," implement standing orders for addressing them, and thereby provide care for "prisoners with specific problems." The court found that "such protocols were never developed." During his deposition, Dr. Stickney was asked about his conversations with jail personnel regarding Brenda Smith. He observed, "I told you repeatedly that I've got untrained people giving me information and I have to temper that very carefully and consider it in a very broad sense because I don't have a nurse or doctor telling me that information, I've got often people that just graduated from high school without any training in what they're trying to convey." In other words, the County allowed untrained officers to make medical assessments and then convey them to an off-site physician.

In addition, the district court cited a report prepared by Jail Commander Dennis Steenrod to Undersheriff Gail Dotson. This report, dated April 2, 2007, was requested by Sheriff Lawrence Richardson after the death of Yolanda Flores, a detainee who died in custody just months before Smith. Steenrod was asked to assess the adequacy of the jail's medical care. His report was prepared just three weeks before Smith's untimely death. Steenrod concluded that "[w]e are exposing Lenawee County, the Board of Commissioners, and the Sheriff to a tremendous amount of liability if we do not make improvements to the inmate health care system." Among other things, Steenrod recommended that the jail have a nurse on duty at least sixteen hours a day, rather than the

then-current average of 2.6, employ an on-site physician at least three hours a week, and provide trained medical personnel to make all medical decisions. Sadly, the Board of Commissioners approved these proposals on April 10 but they were not put into place until June 1, 2007.

Plaintiff's expert, Jeff Eiser, a criminal justice consultant, produced a report in which he echoed Steenrod's conclusion that the jail policies and procedures were inadequate. Specifically, he stated that the administration and staff acted with deliberate indifference to the serious medical needs of Brenda Smith by "failing to take corrective action after it became obvious that her serious medical condition was deteriorating." He also found that the "policy and practice of the Lenawee County Jail and Sheriff Lawrence Richardson, Jr. of using untrained corrections officers to make initial medical assessments and referrals on inmates violates clearly established corrections industry standards and practices."

Based upon this information, as well as certain officers' admissions that they did not fully grasp the difference between alcohol withdrawal and its more serious analogue, *delirium tremens*, the district court concluded that "[t]here is a genuine issue of material fact as to the deliberate indifference of the county."

We uphold the district court's denial of summary judgment to the County. In our view, this is not a close case–at least for purposes of summary judgment. As just explained, the record is replete with facts that raise a genuine issue of material fact with respect to the County's policies and practices in providing medical care in its jail.

F. Gross Negligence Claim

In Michigan, employees of governmental agencies are immune from tort liability unless the employees' conduct amounts to "gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2)(c). The same statute defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(7)(a).

In our earlier opinion involving probation officer Moore, we explained the contours of the proximate cause analysis in gross negligence claims:

> The Michigan Supreme Court has stated that, for the purposes of Michigan's governmental immunity statute, proximate cause means "the one most immediate, efficient, and direct cause preceding an injury." *Robinson v. City of Detroit*, 462 Mich. 439, 613 N.W.2d 307, 317 (2000). In using this narrow definition, the court noted that the Michigan Legislature intentionally used the phrase "*the* proximate cause" in the statute, rather than "*a* proximate cause." *Id.* The *Robinson* court overruled prior Michigan court precedent to the extent that the prior decisions interpreted "the proximate cause" to mean anything other than the sole proximate cause. *Id.* at 318. The court went on to hold that police officers were entitled to governmental immunity in a case where a passenger in a vehicle was killed after the vehicle's driver led police on a high-speed chase. *Id.* at 313, 319. According to the *Robinson* court, no reasonable jury could find that the officers' pursuit of the fleeing vehicle was the "one most immediate, efficient, and direct cause of the plaintiffs' injuries" because the actions of the driver who led police on the chase were the most immediate cause of the injuries. *Id.* at 319.
>
> In an unpublished decision, a Michigan appellate court determined that an investigating officer's failure to give an inmate his blood pressure medication was not the proximate cause of the inmate's subsequent death. *Hartzell v. City of Warren*, No. 252458, 2005 WL 1106360 at *16 (Mich.Ct.App. May 10, 2005). The evidence in *Hartzell* indicated that the defendant-officer was not the officer responsible for booking the decedent nor was he the detention officer responsible for the decedent during confinement. *Id.* at *15. While the evidence indicated that the officer's conduct could have been *a cause* of the decedent's death, the officer's conduct was not the one most immediate cause of death because other evidence showed that

> substandard medical care on the part of the jail's nurse and physician was the most immediate cause of the death. *Id.* at *16.

> On the other hand, this court has determined that a nurse was not entitled to summary judgment on the issue of governmental immunity under Michigan's immunity statute where the nurse provided inadequate treatment to an inmate suffering from heat exhaustion. *Dominguez [v. Corr. Med. Servs.]*, 555 F.3d 543, 546-48, 552-53 (6th Cir. 2009). The inmate in *Dominguez* had participated in an outdoor weight-training session prior to becoming ill, and his untreated condition ultimately led to quadriplegia and impaired communication abilities. *Id.* at 548. In denying the nurse's motion for summary judgment, this court reasoned that a reasonable jury could conclude that the nurse's actions were the proximate cause of the inmate's injuries because the inmate's condition continued to deteriorate after the exercise session and the inmate repeatedly sought care from the nurse. *Id.* at 553.

*Smith*, 600 F.3d at 691. The district court in this case concluded that little practical difference existed between the federal deliberate indifference standard and "substantial lack of concern for whether an injury results." It went on to conclude that "there is evidence that each of the defendants had the ability to intervene to help Brenda Smith in the last hours of her life." In its view, that evidence created a jury question which precluded summary judgment.

Defendants admitted that Dr. Stickney's failure to order her transferred to a hospital was a proximate cause of her death. If that is the case, defendants ask, how can they be the proximate cause of Smith's injury? They cite *Hartzell*, the unpublished Michigan appellate decision discussed in *Smith, supra,* in support. In that case, the court assumed that a defendant officer in the jail had been grossly negligent. *Hartzell*, 2005 WL 1106360 at *16. However, it held that he was entitled to governmental immunity for this reason:

> Plaintiff argues that decedent's hypertension and failure to receive Catapres was the proximate cause of decedent's death, thus, Officer Galasso as a person who failed to make sure he received this medication was the proximate cause. Plaintiff's claims against Officer Galasso stem from his contact with decedent on July 25, 1998, before

he was placed in the cell, and then again on July 27, 1998 when he was arraigned after which decedent was transferred to Macomb County Jail. Upon arrival at Macomb County Jail, decedent was examined by both Nurse Cisco and Dr. Bedia prior to when he was found unconscious in his cell on July 28, 1998. Clearly, the one most immediate, efficient, and direct cause of decedent's death was not his contact with Officer Galasso and Officer Galasso's failure to take action. Plaintiff's affidavits of merit further support that Officer Galasso was not the proximate cause of decedent's injuries as both Dr. Neil Farber and Nurse Gail Serrian indicate that the breach of the standard of care by Dr. Bedia and Nurse Cisco was the proximate cause of decedent's death. Officer Galasso's conduct, again assuming gross negligence, while a cause of decedent's death, it was but one cause, and was therefore, not "the one most immediate, efficient, and direct cause" as required by *Robinson*.

*Id.* In other words, when a party takes the position–in this case through the affidavits of its experts–that certain defendants are the proximate cause of an injury, other defendants who have less culpability are off the hook because *Robinson* made clear that there can only be "one most immediate, efficient, and direct cause preceding an injury." *Robinson*, 613 N.W.2d at 311.

Defendants raised this argument below and the district court dismissed it, reasoning that "plaintiff is entitled to plead in the alternative. If there is evidence that tends to show that more than one defendant's gross negligence may have been 'the' proximate cause of Smith's death, the plaintiff may present that case to a jury."

In our view, the district court correctly concluded that defendants' contention that their admission that Dr. Stickney's actions were the proximate cause of Smith's death is not fatal to her gross negligence claim. Plaintiff can plead in the alternative. We also agree with the district court that the standards for making out a federal claim for deliberate indifference and a Michigan state law claim for gross negligence are substantially similar. If anything, the hurdle required in the federal context is more onerous because the defendant must have drawn the inference that a substantial risk

of serious harm existed.  If follows, then, that those defendants to whom summary judgment based upon qualified immunity is denied–Dr. Stickney, Sergeant Craig, and Officer Vanderpool–are likewise not entitled to summary judgment with respect to the gross negligence claim.  It is true that only one of the can be *the* proximate cause.  The identity of that party is up to a jury to decide.

### III.

The judgment is **affirmed in part** and **reversed in part**.  The cause is **remanded** for further proceedings consistent with this opinion.

Kethledge, J., concurring in part and dissenting in part. I agree with the majority on all but one issue. Specifically, I would affirm the district court's denial of qualified immunity to Westgate. Unlike Dye—who I think presents a close case, but who at least showed concern by putting Smith in a padded cell and calling Dr. Stickney—Westgate basically took no action at all during his four-hour shift on the night before Smith died. I also think he had ample time to observe Smith's condition, and that Stickney's "advice" to Dye—which was dubious to begin with—was becoming pretty stale by the end of Westgate's shift. Thus, I agree with the district court that "[a] jury could conclude that Westgate's delay in providing medical care to Smith under the circumstances could constitute deliberate indifference."

On that issue, then, I respectfully dissent. Otherwise I concur in the majority's opinion.