**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0539n.06

No. 19-2266

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 17, 2020
DEBORAH S. HUNT, Clerk

DAFINKA STOJCEVSKI, as personal representative of
David Stojcevski, deceased,

    Plaintiff-Appellee,

v.

MACOMB COUNTY, MICHIGAN; WALTER OXLEY;
MORGAN COONEY; PAUL HARRISON; JOHN TA-
LOS; BRIAN PINGILLEY; BRIAN AVERY; STEVEN
VANEENOO,

    Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DIS-
TRICT COURT FOR
THE EASTERN DIS-
TRICT OF MICHIGAN

BEFORE: MOORE, CLAY, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. After David Stojcevski failed to appear in court for a careless-driving charge, a Michigan judge ordered him to pay $772 or spend 30 days in jail. As a result, Stojcevski was booked into the Macomb County Jail on June 11, 2014. Sixteen days later, he died from a severe prescription-drug withdrawal. During the last two days of Stojcevski's life, corrections deputies watched him lying on his cell floor naked, convulsing, and without eating or drinking. Although some deputies had previously sought medical assistance for Stojcevski, he received no medical care over these final two days. According to the district court, a reasonable jury could

find that the deputies had been deliberately indifferent to Stojcevski's serious medical needs in violation of the Eighth Amendment. *See Stojcevski v. County of Macomb*, 2019 WL 4744432, at *18–19 (E.D. Mich. Sept. 30, 2019).

In this qualified-immunity appeal, the deputies do not dispute the law: They concede that clearly established law required them to re-alert medical staff if Stojcevski's condition had "significantly worsened" after he received medical aid. *Preyor v. City of Ferndale*, 248 F. App'x 636, 644 (6th Cir. 2007). The deputies instead dispute the facts: They argue that they reasonably relied on medical staff and that the district court wrongly found a genuine issue of material fact over whether Stojcevski's condition had significantly worsened. In this interlocutory appeal, however, we lack appellate jurisdiction to consider the deputies' evidentiary claim that the record conclusively shows that Stojcevski's condition had not changed. *See Brown v. Chapman*, 814 F.3d 436, 445–46 (6th Cir. 2016). We thus dismiss the deputies' appeal (along with Macomb County's appeal) for lack of jurisdiction.

I

A

Taking the evidence in the light most favorable to Stojcevski's estate, the district court described the days before his death in detail. *See Stojcevski*, 2019 WL 4744432, at *2–8. Macomb County contracted with Correct Care Solutions to provide medical care to inmates, and the jail's medical staff worked for this company. During his June 11 booking, Stojcevski met with an intake nurse. He told the nurse that he had been taking only one prescription medication, methadone. The nurse initiated an opiate-withdrawal protocol because Stojcevski would not be receiving this opioid while in jail. *See id.* at *2. Under the protocol, nurses would visit Stojcevski, take his vitals, measure his symptoms, and report any red flags like seizures, delirium, or dehydration.

This protocol required the nurse to alert doctors immediately if Stojcevski also faced a risk of polysubstance (not just opiate) withdrawal. And, despite what Stojcevski had said, he had been taking more than just methadone. Yet the nurse did not verify whether Stojcevski had been prescribed other drugs by calling his pharmacy, a lapse that apparently conflicted with the medical staff's normal practice. If this practice had been followed, the nurse would have discovered that Stojcevski had been regularly filling prescriptions for several other drugs, including oxycodone and two benzodiazepines, Xanax and Klonopin. Benzodiazepine withdrawal can be life-threatening. Given the failure to discover these other prescriptions, however, the nurse never alerted doctors at the jail of Stojcevski's risk of any polysubstance withdrawal. *See id.* at *2–3.

Between June 11 and June 15, nurses visited Stojcevski many times in the jail's general population to measure his withdrawal symptoms. The symptoms consistently scored as mild to nonexistent. Inmates finish this protocol if their symptoms measure no more than mild for 72 hours. On June 15, therefore, a nurse documented that Stojcevski's opiate-withdrawal protocol was complete. *See id.* at *3.

On June 17, however, Stojcevski began exhibiting some withdrawal red flags. That morning, a corrections deputy reported finding Stojcevski lying "on his back on his bunk blinking his eyes" and apparently "unable to speak or move." A nurse took him to the medical director. The director's later-recorded notes from this visit stated that he "observed [Stojcevski] fluttering his eyes in what was certainly not a seizure but what was most likely his poor attempt to feign one." The director returned Stojcevski to the general population. That afternoon, another deputy found Stojcevski hallucinating and "talking to [people] that are not there[.]" This deputy referred Stojcevski to the mental-health unit. *See id.* at *4.

The mental-health unit was monitored by corrections deputies who worked three eight-hour shifts: a midnight shift, followed by a day shift, followed by an afternoon shift. Deputies used a "Mental Health Log Book" to record who worked each shift, to document their security rounds, and to make occasional notes about specific inmates. During each shift, deputies filled three different positions: the mental health control officer, the mental health runner, and the D-Block runner. The control officer sat in the Mental Health Duty Station and watched video feeds from the cells. The mental health runner conducted security rounds every hour by going cell-to-cell and checking on each inmate's well-being. The D-Block runner performed the same function, but for a different portion of the jail. On occasion, though, the D-Block runner would be called to a cell in the mental-health unit. And when the two runners were not out making rounds, they were stationed in the Mental Health Duty Station with access to the video monitors.

After Stojcevski was referred to this unit on June 17, he was placed in a cell some six or seven feet from the Mental Health Duty Station. The control officer in this station could see into his cell through a window and could monitor him via the video. Stojcevski was placed into the "high observation green" category, which meant he could wear only a green anti-suicide gown and possess no blankets or personal items. On his first night, Stojcevski's seizure-like symptoms and hallucinatory behaviors continued. Deputy Paul Harrison found Stojcevski "twitching on the ground" in his cell. Harrison called for nurses. According to their notes, Stojcevski told them that "all his organs, but 10% of his heart was removed and his arms shre[d]ded a couple days ago[.]" After checking his vitals, the nurses cleared him. *See id.* at *4–5.

On June 18, a mental-health professional visited Stojcevski for the first of ten daily mental-health assessments. During these visits, the professionals spoke with Stojcevski from outside his cell. After the visits, they sent memos to jail command noting that Stojcevski should remain under

4

high observation. During this first assessment, the professional recorded that Stojcevski was exhibiting eyelid fluttering and that he refused to speak. At her request, two nurses checked on him. One nurse took his vitals. Her notes indicate that he did not appear hallucinatory, tolerated water "without difficulty," and stated that he took Klonopin for anxiety but had not done so for two weeks. The nurses told the deputies to notify medical staff of any changes in status. That evening, video shows that Stojcevski received one more nurse visit. The nurses appear to have checked his vitals and remained for about four minutes. *See id.* at *5–6.

From June 19 to June 23, the mental-health professionals regularly found Stojcevski lying naked on the floor or a bunk with his eyelids fluttering. (According to a deputy, the anti-suicide gowns are uncomfortable, so inmates often refuse to wear them.) Over these days, the video suggests that Stojcevski received five nurse visits. The nurses did not record any notes for these visits, but the Mental Health Log Book occasionally referenced them. On June 19, the log book noted that Stojcevski seemed "more coherent" and was advised to eat. During two visits on June 20, nurses "cleared" him and gave him something to eat. Video from June 21 shows a nurse entering Stojcevski's cell around 2:00 p.m. and spending less than five minutes with him. Stojcevski received no visitors on June 22. Around 4:00 p.m. the next day, a nurse spent some two and a half minutes with him. The log book recorded that Stojcevski was "up and aware" and "drinking water" at this time. Before this visit, however, video shows that he had defecated and urinated on his bunk. He attempted to clean the bunk after the nurse left. The nurse later took him for a shower, and he ate an apple on his return. *See id.* at *6–7.

From this point on, video shows Stojcevski consistently lying down for longer and longer periods. He lay on his bunk from around 8:14 p.m. on June 23 to about 12:45 p.m. on June 24 (more than sixteen hours). A little time later on June 24, he ate for the last time. On the evening

of June 24, a nurse entered his cell for about a minute. Stojcevski remained lying on the floor from 4:36 p.m. that day until 2:10 p.m. on June 25. At that time, he got up for a drink. Yet video again shows him lying down minutes later while suffering convulsions. *See id.* at *7.

Stojcevski did not get up again from this point on the afternoon of June 25 until he was found nonresponsive over two days later. A nurse entered Stojcevski's cell one last time (for under a minute around 9:45 p.m. on June 25), and the log book listed his vitals as "good" after this visit. No evidence suggests he received other medical care. On the afternoon of June 26, the mental-health professional conducting the daily assessment noted that he was "mildly shaking with eye flutters" while lying on the floor. Video also shows a deputy entering Stojcevski's cell late that evening and attempting to engage with him for thirty seconds. He appears unresponsive. By this point on June 26, he had been lying on the floor for about 30 hours. *See id.* at *7–8.

On the morning of June 27, Stojcevski failed to engage with the mental-health professional for the last time. The professional noted he was experiencing eye fluttering while lying on the floor naked. Stojcevski can be seen in the June 27 video "sweating and experiencing significant twitching, convulsions, and involuntary movements of his arms and legs." *Id.* at *8. He also seemed "to be writhing across the cell floor at times and his breathing appear[ed] labored." *Id.* By about 5:20 p.m., Deputy John Talos observed Stojcevski's breathing slowing. Talos and Harrison went to his cell. They found Stojcevski without a pulse, cold to the touch, and incontinent. The deputies began performing CPR and called for medical assistance. Nurses arrived minutes later. At 5:50 p.m., Stojcevski was transported to the hospital, where he was pronounced dead. *See id.*

The medical examiner determined Stojcevski died of "acute withdrawal from chronic benzodiazepine, methadone and opiate medications[.]" The examiner also diagnosed Stojcevski with

dehydration. *See id.* at *8. Before the two deputies entered his cell around 5:20 p.m. on June 27, Stojcevski had not drunk water for about 51 hours (since 2:10 p.m. on June 25) and had not eaten any food for about 76 hours (since 1:00 p.m. on June 24). He had been lying on the floor for 51 hours. Prison records listed Stojcevski's weight as 195 pounds on his June 11 admission to the jail. But he weighed only 151 pounds at the time of his death, so he lost 44 pounds over 16 days. *See id.* at *2, *8. (Some defendants have disputed whether Stojcevski weighed 195 pounds upon his admission, suggesting that his weight from earlier incarcerations had been auto-populated into the records. *See id.* at *19 n.21. But we must view the facts in the light most favorable to Stojcevksi's estate at this stage.)

B

Stojcevski's estate brought this suit under 42 U.S.C. § 1983 against Macomb County, many of the medical staff who worked for Correct Care Solutions, and many of the deputies who monitored Stojcevski, including the seven who filed this appeal: Paul Harrison, Morgan Cooney, John Talos, Brian Avery, Walter Oxley, Brian Pingilley, and Steven Vaneenoo (collectively, the "Deputies"). These seven Deputies "were each on duty in the mental health unit for numerous shifts" while Stojcevski was housed there, including during the days leading up to his death. *Stojcevski*, 2019 WL 4744432, at *18. The estate sought to hold them liable under the Eighth Amendment, alleging that they had been deliberately indifferent to Stojcevski's serious medical needs. The estate also sought to hold Macomb County liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging that the County had provided constitutionally inadequate training to the jail's staff.

The defendants moved for summary judgment. Although the district court granted summary judgment to some defendants (including four other deputies who had monitored Stojcevski),

it denied summary judgment to the Deputies and the County. *Stojcevski*, 2019 WL 4744432, at *21. It initially denied the Deputies' request for qualified immunity on the estate's deliberate-indifference claim. *Id.* at *18–19. This type of claim, the court recognized, required the estate to show that Stojcevski had an objectively serious medical need, that the Deputies subjectively knew of his serious need, and that they unreasonably disregarded it. *Id.* at *9. On the objective element, the court cited caselaw indicating that withdrawal symptoms like Stojcevski's are objectively serious. *Id.* at *10. On the subjective element, the court noted that the Deputies worked shifts on "several days immediately before [Stojcevski] died" and that they had monitored his conduct during this time on video or when making rounds. *Id.* at *18. This evidence, the court concluded, would allow a jury to find that the Deputies were "subjectively aware" of Stojcevski's serious medical need. *Id.* Lastly, on whether the Deputies responded reasonably to that need, the court rejected their defense that they had relied on the jail's medical personnel to treat Stojcevski. *Id.* at *18–19. The court reasoned that the video of Stojcevski "reflect[ed] that his condition was deteriorating," but the Deputies never alerted medical staff to check on him again. *Id.*

Turning to Macomb County, the court found that the estate's inadequate-training claim raised a triable issue on two separate grounds. *See id.* at *20–21. The court initially suggested that Correct Care Solutions had failed to provide enough training to the jail's "medical staff in connection with inmates exhibiting potentially life-threatening withdrawal symptoms." *Id.* at *20. And the court approvingly cited decisions from other district courts holding "that where a municipality delegates the final authority to make decisions about inmate medical care to a private vendor, the vendor's policies or customs become those of the county." *Id.* It thus read § 1983 to allow Stojcevski's estate to hold the County liable for the alleged training failures of Correct Care Solutions. *Id.* In addition, the court noted that the jail's non-medical staff will often encounter inmates

going through drug withdrawals and so "the county's need to train [this] staff regarding drug withdrawal, in general, and benzodiazepine withdrawal, in particular, is obvious." *Id.* at *21. The court concluded that a reasonable jury could find that the County had not provided adequate training to its deputies about this serious medical condition. *Id.*

II

The Deputies bring this immediate appeal on qualified-immunity grounds, and the County relies on our pendent jurisdiction for its appeal. We lack jurisdiction over both appeals.

A. The Deputies' Appeal

1. Two background legal principles are central to the Deputies' appeal. The first is the defense of qualified immunity to a constitutional claim under 42 U.S.C. § 1983. "Qualified immunity shields a government official from money damages (and litigation) unless the official's conduct violated a 'clearly established' legal rule." *Beck v. Hamblen County*, 969 F.3d 592, 599 (6th Cir. 2020) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). This immunity requires a plaintiff to identify a legal rule that is "'particularized' to the facts of the case," such that the government defendants had "fair and clear warning" that their conduct violated the law. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (citation omitted); *accord Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992–93 (6th Cir. 2017).

The second is the so-called "collateral-order doctrine," which gives circuit courts appellate jurisdiction over some otherwise non-final orders. Ordinarily, we have jurisdiction only over appeals from a district court's "final decisions"—those that completely resolve a case. 28 U.S.C. § 1291. We would not normally treat a decision denying summary judgment, like the decision in this case, as a "final" one. *See Brown v. Chapman*, 814 F.3d 436, 444 (6th Cir. 2016). After all, these types of decisions mandate further proceedings, including a trial. But the Supreme Court

has long treated some "collateral orders"—those that resolve an issue collateral to the merits of the case—as sufficiently final and thus immediately appealable. *See id.* at 443.

How do these two legal principles interrelate? The Supreme Court has held that a district court's decision denying qualified immunity to a government official falls within the limited category of immediately appealable collateral orders. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). The Court reasoned that qualified immunity provides an "*immunity from suit* rather than a mere defense to liability" and that government officials would effectively lose this immunity if they had to wait until a suit's end to vindicate the immunity on appeal. *Id.* at 526. Yet the Court also held that we do not have unlimited jurisdiction over any interlocutory appeal touching on qualified immunity. Instead, appellate jurisdiction extends over a qualified-immunity order "only 'to the extent that it turns on an issue of law[.]'" *Brown*, 814 F.3d at 444 (quoting *Mitchell*, 472 U.S. at 530). If, by contrast, the qualified-immunity order decides only "a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial," the court lacks immediate jurisdiction to review the order. *Plumhoff v. Rickard*, 572 U.S. 765, 772 (2014) (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)).

Our binding caselaw has interpreted this dichotomy to give us appellate jurisdiction only over certain legal arguments arising from a district court's qualified-immunity order. On the one hand, when taking the evidence in the light most favorable to the plaintiff, we may review an argument that the defendant's conduct did not "violate[] a constitutional right" or that the claimed right was not "clearly established" when the defendant acted. *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015). On the other hand, we may not review an argument that "merely quibble[s] with the district court's reading of the factual record[.]" *Brown*, 814 F.3d at 446 (citation omitted). "[F]act questions, including questions of evidentiary sufficiency, are out of our

hands" in this interlocutory posture. *Bullock v. City of Detroit*, 814 F. App'x 945, 949 (6th Cir. 2020) (citation omitted); *see also Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc).

2. Under this framework, we lack jurisdiction over the Deputies' appeal because they dispute a factual question, not a legal one. We start with the relevant Eighth Amendment law. "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To prevail on this deliberate-indifference claim, Stojcevski's estate must show: (1) that Stojcevski had an objectively serious medical need; (2) that the Deputies were subjectively aware of this need; and (3) that the Deputies responded unreasonably to it. *See Rhinehart v. Scutt*, 894 F.3d 721, 737–38 (6th Cir. 2018); *Darrah v. Krisher*, 865 F.3d 361, 367–68 (6th Cir. 2017); *see also Beck*, 969 F.3d at 600. Because § 1983 does not permit Stojcevski's estate to impose vicarious liability on one Deputy for the actions of others, the estate must satisfy these requirements for each of the Deputies. *See Smith v. County of Lenawee*, 505 F. App'x 526, 532 (6th Cir. 2012); *see also Beck*, 969 F.3d at 600. And because the Deputies have invoked qualified immunity, the estate must prove that their specific conduct violated clearly established legal rules. *See Arrington-Bey*, 858 F.3d at 992.

When applying these general principles to this appeal, the parties all but agree on what qualifies as the clearly established law. Indeed, the Deputies do not challenge the first two requirements of the estate's deliberate-indifference claim. To begin with, they have conceded that it is clearly established that Stojcevski's condition (a drug withdrawal that led to his death) amounted to an objectively serious medical need for Eighth Amendment purposes. Oral Arg. 1:07–1:21; *see, e.g.*, *Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007); *see also French v. Daviess County*, 376 F. App'x 519, 522 (6th Cir. 2010). In addition, the Deputies have conceded that the video footage of Stojcevski's cell, among other things, offers enough evidence

to create a fact question over whether they each subjectively knew that Stojcevski's condition required medical care. Oral Arg. 1:22–1:54; *cf. Preyor*, 248 F. App'x at 643–44.

This appeal thus concerns only the third part of the deliberate-indifference inquiry: Did the Deputies respond unreasonably to Stojcevski's serious medical need and, by doing so, violate clearly established Eighth Amendment law? *See Rhinehart*, 894 F.3d at 738. On appeal, the Deputies assert a general defense applicable to all seven of them, rather than any defendant-specific defenses. They argue that they acted reasonably because they were deferring to the medical staff's opinions about the proper care for Stojcevski. On June 17, for example, Deputy Harrison called for medical assistance when he noticed that Stojcevski was lying on the ground shaking, and the nurses medically cleared him. On June 18, Deputy Cooney also called for assistance when he found Stojcevski unresponsive and slightly shaking in his cell, and the nurses again medically cleared him. And Deputy Talos recalled that the nursing staff told him at some point that Stojcevski was detoxing and that his general behavior was normal. The other four Deputies had no independent memory of Stojcevski and so could not recall any specific assistance that they requested. But they likewise discussed their general practice of requesting medical aid when they have concerns for an inmate's health and of relying on the medical staff for an inmate's proper medical care.

What is the relevant law for this type of defense? Here, too, the parties do not disagree about the clearly established legal principles governing this third legal requirement of a deliberate-indifference claim. For its part, Stojcevski's estate recognizes our unpublished caselaw holding generally "that a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he 'reasonably deferred to the medical professionals' opinions.'" *McGaw v. Sevier County*, 715 F. App'x 495, 498 (6th Cir. 2017) (quoting *Johnson v. Doughty*,

433 F.3d 1001, 1010 (7th Cir. 2006)); *see also, e.g.*, *Smith*, 505 F. App'x at 532. For their part, the Deputies concede that, even under this *McGaw* line of unpublished cases, corrections officers have a duty to reengage medical staff if an inmate's "condition ha[s] significantly worsened" since the inmate received medical care. *Preyor*, 248 F. App'x at 644; Oral Arg. 28:44–29:16. As one of our unpublished cases summarizes things, "an officer who seeks out the opinion of a doctor is generally entitled to rely on a reasonably specific medical opinion for a reasonable period of time after it is issued, absent circumstances such as the onset of new and alarming symptoms[.]" *Barberick v. Hilmer*, 727 F. App'x 160, 163–64 (6th Cir. 2018) (per curiam).

Not disputing the law, the Deputies instead dispute the "basic facts" about what actually happened. They claim that Stojcevski's condition did not significantly worsen in the mental-health unit and so did not trigger any duty to re-alert the nursing staff. *Williams*, 186 F.3d at 690; *see Preyor*, 248 F. App'x at 644. They argue that Stojcevski's conduct during the earlier days that he was housed in the mental-health unit was not much different from his conduct during the later days that he was housed in that unit closer to his June 27 death. The district court, by contrast, pointed to video evidence of deterioration, including what it described as "alarming changes" in Stojcevski's condition. *Stojcevski*, 2019 WL 4744432, at *19 n.22; *see also id.* at *19. Stojcevski, among other things, had not eaten for several days, had not taken even a sip of water for over two days, and had been lying on the floor for over 50 hours. This factual debate about Stojcevski's condition is the crux of the parties' disagreement on appeal. The debate shows that the Deputies' appeal does not ask us to clarify what qualifies as the governing Eighth Amendment law for the estate's claim or to consider whether that governing law was clearly established (and so we do not decide on the proper legal rules for their appeal). *See DiLuzio*, 796 F.3d at 609. Rather, the

Deputies' appeal "merely quibble[s] with the district court's reading of the factual record[.]" *Brown*, 814 F.3d at 446 (citation omitted).

In this respect, the Deputies' arguments about the historical facts are not much different from the defendants' arguments about the historical facts in the Supreme Court's *Johnson* decision. There, the plaintiff sued five police officers for allegedly beating him in violation of the Fourth Amendment's ban on excessive force. 515 U.S. at 307. Three officers moved for summary judgment on the ground that they had not been present during the alleged altercation. *Id.* The district court found that enough circumstantial evidence suggested that they had, in fact, been present to create a triable issue about this historical fact. *Id.* at 308. After the officers appealed that ruling, the Supreme Court held that the appellate court lacked jurisdiction over the district court's conclusion "that the summary judgment record in this case raised a genuine issue of fact concerning [the officers'] involvement in the alleged beating[.]" *Id.* at 313. Simply change the critical fact (from whether the police officers were present at the scene to whether the inmate's condition had deteriorated) and this case is *Johnson* all over again. *See also Brown*, 814 F.3d at 445–46. We thus conclude that we lack jurisdiction over the Deputies' interlocutory appeal.

## B. The County's Appeal

We reach the same conclusion for Macomb County's appeal. Our cases hold that, unlike an individual official sued under § 1983, a municipality "is not entitled to invoke the defense of qualified immunity and therefore has no grounds to seek an interlocutory appeal of the district court's denial of its motion for summary judgment." *Campbell v. City of Springboro*, 700 F.3d 779, 790 (6th Cir. 2012); *see also Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 41–43 (1995). When, however, individual officials pursue an interlocutory appeal from the denial of qualified immunity, we have sometimes exercised "pendent appellate jurisdiction" over a municipality's

appeal from the denial of summary judgment on a *Monell* claim. *Mattox v. City of Forest Park*, 183 F.3d 515, 523 (6th Cir. 1999); *accord, e.g.*, *Heyne v. Metro. Nashville Pub. Schs.*, 655 F.3d 556, 562 (6th Cir. 2011); *Tucker v. City of Richmond*, 388 F.3d 216, 224 (6th Cir. 2004). Yet we have exercised this type of jurisdiction sparingly, consistent with the Supreme Court's instructions. *See Brennan v. Township of Northville*, 78 F.3d 1152, 1157–58 (6th Cir. 1996) (discussing *Swint*, 514 U.S. at 43–51); *see also Baker v. Union Township*, 587 F. App'x 229, 237 (6th Cir. 2014). A municipal appeal of a *Monell* ruling must be "inextricably intertwined" with the official's appeal of a qualified-immunity ruling, such that our resolution of the qualified-immunity appeal would "necessarily resolve" the municipal appeal. *Crockett v. Cumberland College*, 316 F.3d 571, 579 (6th Cir. 2003) (citation omitted); *see also Floyd v. City of Detroit*, 518 F.3d 398, 410–11 (6th Cir. 2008); *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604–05 (6th Cir. 2005).

Macomb County's appeal cannot meet this jurisdictional test. The County's appeal is not inextricably intertwined with the Deputies' appeal because the County asks us to resolve a separate legal question that has nothing to do with whether the Deputies were deliberately indifferent to Stojcevski's serious medical needs. *See Crockett*, 316 F.3d at 579. Specifically, the County argues that the district court wrongly interpreted § 1983 to allow it to be held liable under *Monell* for Correct Care Solutions' failure to train its medical staff. *See Stojcevski*, 2019 WL 4744432, at *20. Even if we had ruled for the Deputies on their qualified-immunity defense, that ruling would not have "necessarily" resolved this distinct legal question. *Crockett*, 316 F.3d at 579.

The County responds that the district court also held that it could be found liable under *Monell* on a second ground—for its failure to train its own staff. *See Stojcevski*, 2019 WL 4744432, at *21. That is true, but it does not establish our jurisdiction over the County's appeal. Our cases make clear that we have pendent appellate jurisdiction over a municipality's separate

appeal only if that appeal is "coterminous with, or subsumed in," the qualified-immunity appeal. *Brennan*, 78 F.3d at 1158 (citation omitted). Because one of the two grounds on which the district court allowed this *Monell* claim to proceed (the ground concerning Correct Care Solutions) bears no relationship to the Deputies' qualified-immunity appeal, the County's appeal is not coterminous with the qualified-immunity appeal. *See id.* We thus lack pendent appellate jurisdiction over Macomb County's appeal.

* * *

For the foregoing reasons, we dismiss this appeal for lack of jurisdiction.