RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0136p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ANNISSA COLSON,

        *Plaintiff-Appellee*,

    *v.*

CITY OF ALCOA, TENNESSEE,

        *Defendant*,

KEITH FLETCHER, individually and in his official capacity as Lieutenant of the Alcoa Police Department; DUSTIN COOK and ARIK WILSON, individually and in their official capacities as Patrol Officers of the Alcoa Police Department,

        *Defendants-Appellants*.

Nos. 20-5585/21-5545

─────────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville;
No. 3:16-cv-00377—Robert Leon Jordan and Charles E. Atchley, Jr., District Judges.

Argued: March 16, 2022

Decided and Filed: June 23, 2022

Before: McKEAGUE, BUSH, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Brian R. Bibb, WATSON, ROACH, BATSON ROWELL & LAUDERBACK, P.L.C., Knoxville, Tennessee, for Appellants. Lance K. Baker, THE BAKER LAW FIRM, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Brian R. Bibb, Benjamin K. Lauderback, WATSON, ROACH, BATSON ROWELL & LAUDERBACK, P.L.C., Knoxville, Tennessee, for Appellants. Lance K. Baker, THE BAKER LAW FIRM, Knoxville, Tennessee, for Appellee.

—————————

## OPINION

—————————

CHAD A. READLER, Circuit Judge.  Annissa Colson's knee was allegedly injured while she resisted arrest.  She claims that the arresting officers failed to provide her sufficient medical care by first taking her to jail instead of a hospital following her injury, and then by relying on a jail nurse's medical opinion that the knee injury did not require further attention.  The officers moved for summary judgment, claiming qualified immunity.  The district court denied their motion, and the officers appealed.  We now reverse.  In doing so, we make clear that Colson's claims (and others like them) are governed by the Fourteenth Amendment.

**I.**

City of Alcoa Officers Dustin Cook and Arik Wilson arrested an obviously inebriated Annissa Colson following a report that, while driving her SUV, she chased her ten-year-old son in a field and then crashed in a ditch.  Colson consented to a draw for a blood alcohol test, and the officers transported her to a hospital.  Upon arriving at the hospital and exiting Cook's police cruiser, however, Colson withdrew that consent.  When she did, the officers told her that they would need to take her to jail and get a warrant for the blood draw.  But Colson defied the officers' repeated orders to get back into the cruiser.

At this point, the officers began to physically force Colson into the vehicle.  Cook tried to pull Colson in from the driver's side of the vehicle, and Wilson tried to push her in from the passenger's side.  Colson resisted their efforts while yelling and swearing.  In his struggle with Colson, Wilson states that his knee touched Colson's knee.  There was an audible "pop" sound, followed by Colson screaming "ow, my fucking knee, motherfucker!"  Nonetheless, Colson continued to resist the officers' attempts to get her into the cruiser while yelling and swearing, for example, "you cracked my knee ten fucking times, motherfucker!"  Eventually, Cook succeeded in putting Colson into the back seat of the cruiser.

Wilson told Cook that he heard Colson's knee pop while his knee touched hers.  And he asked Cook if he "want[ed] to get [Colson's] knee looked at."  After Cook called a supervisor, he

told Wilson that they would take Colson to the Blount County jail where a nurse would perform the blood draw. As she was being transported to the jail, Colson never asked the officers for medical care or to be taken to the hospital.

When the cruiser arrived at the jail, Colson exited the vehicle under her own power and walked inside. She neither limped nor otherwise indicated that she was injured. As she was frisked by a jail officer, however, Colson fell to the ground and said "ow, ow my fucking knee." After a jail officer helped her stand up, Colson stood for several minutes. At one point, she took a step forward and appeared unsteady. Still, Colson did not ask for medical care for her knee.

Cook asked for the jail nurse, Jennifer Russell. When Russell arrived, a jail officer asked her to examine Colson. Russell began by asking Colson to perform various motions with the injured leg. While being yelled at by Colson, Russell bent down to compare Colson's knees. When Russell asked Colson to straighten her leg against the wall, Colson responded "I can't." Once more, Russell bent down to examine the knee. Following the examination, which lasted approximately a minute, Russell commented "I don't see no swelling," and left the room. Later that evening, Russell completed a blood draw; Colson's blood alcohol level was nearly twice the legal limit.

Colson bonded out of jail the next morning. A week, an emergency room visit, two doctor's appointments, and an MRI later, Colson was diagnosed with a torn anterior cruciate ligament (ACL), a strained lateral collateral ligament (LCL), and a small avulsion fracture of the fibular head (a piece of bone connected to the LCL). Nearly two years after that, Colson had corrective surgery for her torn ACL.

As Colson's medical troubles unfolded, so did her legal ones. Colson's refusal to enter the police cruiser and other belligerent acts led to charges for resisting arrest and assaulting a police officer. Colson pleaded guilty to resisting arrest, reckless endangerment, and driving under the influence. Yet the legal saga stemming from her arrest was just beginning. Colson sued Wilson and Cook as well as the City of Alcoa, Blount County, and other employees of Alcoa and Blount County, alleging various civil rights and state law violations. As to the claims against Wilson and Cook, the district court either dismissed or granted summary judgment on all

but the claim for failure to provide medical care for her knee injury. On that claim, the district court denied the officers' motion for summary judgment raising qualified immunity. The officers timely appealed.

**II.**

Two familiar appellate law principles guide our consideration in this appeal. One is the standard of review: we review the district court's denial of Wilson and Cook's summary judgment motion de novo, construing the evidence and drawing all reasonable inferences in favor of Colson, as the non-moving party. *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 445 (6th Cir. 2021). To that end, summary judgment is appropriate only where the moving party shows "that there is no genuine dispute as to any material fact" and the party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The other is the jurisdictional limits on appellate review of a qualified immunity denial. *Coffey v. Carroll*, 933 F.3d 577, 583 (6th Cir. 2019). In this interlocutory posture, we have jurisdiction to consider a challenge to "the district court's legal determination that the [officers'] actions violated a constitutional right or that the right was clearly established." *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015). As the officers do not contest the district court's recitation of the facts and raise only legal issues—namely, whether the officers' conduct violated Colson's clearly established constitutional right—we have jurisdiction to review their claims. *See Bunkley v. City of Detroit*, 902 F.3d 552, 561 (6th Cir. 2018) (noting that we have jurisdiction to "make the legal determination of whether the defendant violated a clearly established right, based on those now (for this purpose) undisputed record facts").

A. Before turning to the officers' qualified immunity defense, however, we must first determine which constitutional right the officers allegedly violated. *See Graham v. Connor*, 490 U.S. 386, 394 (1989) ("The first inquiry in any § 1983 suit is to isolate the precise constitutional violation with which the defendant is charged." (cleaned up) (citation omitted)). As no one contends that Colson was an "inmate" at the time of her injury, we can set aside the Eighth Amendment. *See Whitley v. Albers*, 475 U.S. 312, 318–22 (1986) (holding that an "inmate"— one who has been adjudicated guilty of a crime—has a right to medical care enshrined in the

Eighth Amendment). That leaves two candidates identified by the parties (and, to some extent, precedent): the Fourth and Fourteenth Amendments.

1. The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. CONST. amend. IV. In a nutshell, the Amendment is routinely applied to challenge the government's unreasonable search or seizure of an individual or her property. *See, e.g.*, *Florida v. Jardines*, 569 U.S. 1 (2013) (search of property); *Graham*, 490 U.S. 386 (seizure of person); *United States v. Place*, 462 U.S. 696 (1983) (seizure of property); *Terry v. Ohio*, 392 U.S. 1 (1968) (search and seizure of person). To determine if a search or seizure was unreasonable, and thus unconstitutional, courts balance the degree of intrusion on the individual's interests against "the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *Place*, 462 U.S. at 703).

Comparatively, the Fourteenth Amendment, as relevant here, commands that the government shall not "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1. That provision has been read as creating a substantive due process right to certain medical care for those in the government's custody. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989).

For claims concerning injuries sustained while in police custody, there is sometimes a dispute over whether the Fourth or Fourteenth Amendment governs the constitutionality of the officer's conduct. After all, the point at which the Fourth Amendment's prohibition against unreasonable seizures ends and the Fourteenth Amendment's substantive due process right begins is not always obvious. *See, e.g.*, *Graham*, 490 U.S. at 393–95. For instance, in *Aldini*, we held that when a person in custody asserts an excessive force claim against an officer, a judicial determination of probable cause is the "dividing line" between application of the two amendments. *Aldini v. Johnson*, 609 F.3d 858, 865–66 (6th Cir. 2010). Under the *Aldini* paradigm, the Fourth Amendment governs an excessive force claim brought by an "arrestee"— one who has been arrested but has not yet received a judicial determination of probable cause, either through an arrest warrant or a post-arrest probable cause hearing. *Id.* at 866. The Fourteenth Amendment, on the other hand, provides the same protection for a "pretrial detainee"—a person who has received a judicial determination of probable cause but has not yet

been adjudicated guilty of a crime. *Id.*; *see also Bell v. Wolfish*, 441 U.S. 520, 535–36, 545 (1979).

We hold that Colson's medical care right is governed by the Fourteenth Amendment. That is the straightforward conclusion from a series of decisions in which the Supreme Court applied the Fourteenth Amendment to analyze medical care claims arising out of events as early as the time of apprehension by police, *see City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983), and as late as the period of pretrial detention, *see Bell*, 441 U.S. 523, 545. Additionally, in *DeShaney*, the Supreme Court explained that the Fourteenth Amendment imposes on the government an affirmative duty to provide medical care to all those it takes into its custody, regardless of the person's precise legal status. *DeShaney*, 489 U.S. at 199–200. That includes, as the facts of this case present, the period after arrest but before a judicial finding of probable cause.

Our cases are largely in accord with this framework. Take, for instance, *Watkins v. City of Battle Creek*. There, we relied on *City of Revere* to note that the Fourteenth Amendment's Due Process Clause provided a person detained without a judicial determination of probable cause "a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685–86 (6th Cir. 2001). We have done much the same in a host of other cases. *See, e.g.*, *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 990–93 (6th Cir. 2017) (applying the Fourteenth Amendment to analyze claims that arresting officers, jail guards, and jail doctor provided inadequate medical care to an arrestee); *Burgess v. Fischer*, 735 F.3d 462, 470, 476 (6th Cir. 2013) (recognizing that "[t]he Fourteenth Amendment's Due Process Clause governs" an arrestee's claim that a jail nurse provided inadequate medical care); *Harris v. City of Circleville*, 583 F.3d 356, 367–68 (6th Cir. 2009) (applying the Fourteenth Amendment deliberate indifference standard to an arrestee's claim that jail officers provided inadequate medical care); *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003) (recognizing that "[t]he Fourteenth Amendment's Due Process Clause . . . affords" an arrestee with the right to adequate medical care).

More broadly, eight other courts of appeals also apply the Fourteenth Amendment to arrestees' claims for failure to provide medical care. *See, e.g.*, *Tardif v. City of New York*, 991

F.3d 394, 398–99, 405 n.9 (2d Cir. 2021); *Mays v. Sprinkle*, 992 F.3d 295, 298–300 (4th Cir. 2021); *Batyukova v. Doege*, 994 F.3d 717, 722–24, 732–33 (5th Cir. 2021); *Smith v. Kilgore*, 926 F.3d 479, 486 (8th Cir. 2019); *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 74 (1st Cir. 2016); *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015); *Barrie v. Grand County*, 119 F.3d 862, 863–64, 867–69 (10th Cir. 1997); *Groman v. Township of Manalapan*, 47 F.3d 628, 632–33, 636–37 (3d Cir. 1995). And the Supreme Court has cited with approval two decisions of this ilk. *See County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) (first citing *Barrie*, 119 F.3d at 867–69; and then citing *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)).

Precedent to the contrary is scant. The Ninth Circuit has flagged the issue but has yet to decide which right applied to an arrestee's failure to provide medical care claim. *J. K. J. v. City of San Diego*, 17 F.4th 1247, 1257 (9th Cir. 2021). Only the Seventh Circuit, it appears, has concluded that the Fourth Amendment governs a failure to provide medical care to an arrestee. *See, e.g.*, *Currie v. Chhabra*, 728 F.3d 626, 630–31 (7th Cir. 2013).

2. Despite this mountain of authority, Colson contends that the Fourth Amendment is the constitutional prism through which we should review her claims that the officers failed to provide her with medical care. Doing so, however, is not only at odds with legions of prior decisions, but also with the Amendment's text itself. The Fourth Amendment, recall, concerns only "searches and seizures." U.S. CONST. amend. IV. Both at the founding and today, a "seizure is a single act" "to restrain." *California v. Hodari D.*, 499 U.S. 621, 625–26 (1991) (quoting *Thompson v. Whitman*, 18 Wall. 457, 471 (1874)); *see also Torres v. Madrid*, 141 S. Ct. 989, 995, 999 (2021). A failure to provide medical care is not a seizure, as it is not an affirmative act to restrain another. Rather, it is inaction in the face of a duty to provide adequate care. *DeShaney*, 489 U.S. at 198. And, by definition, the right to medical care is triggered only once a person is in the government's custody, which follows a seizure. *Id.* at 200. So the right to medical care and the Fourth Amendment's right to be free from unreasonable seizures are distinct, both conceptually and temporally. *See Smith v. Erie Cnty. Sheriff's Dep't*, 603 F. App'x 414, 425 (6th Cir. 2015) (Batchelder, J., concurring in part and concurring in the result) (noting that an arrestee's right to medical care has "nothing to do with either a 'search' or a 'seizure'"); *Bell*, 441 U.S. at 533–34 (noting that a claim concerning conditions of pretrial confinement is

"not concerned with the initial decision to detain an accused and the curtailment of liberty that such a decision necessarily entails").

True, as Colson emphasizes, *Aldini* held that the Fourth Amendment applies to excessive force claims for incidents arising before a probable cause determination. 609 F.3d at 865–66. But we have never extended *Aldini* to hold that the Fourth Amendment governs an arrestee's claim of inadequate medical care. At times, we have suggested in dicta that there is "an open question" on the matter. *E.g.*, *Esch v. County of Kent*, 699 F. App'x 509, 514–15 (6th Cir. 2017); *Smith*, 603 F. App'x at 418–22; *Shaver v. Brimfield Township*, 628 F. App'x 378, 381 n.3 (6th Cir. 2015); *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 406 n.2 (6th Cir. 2015); *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.3 (6th Cir. 2005); *Boone v. Spurgess*, 385 F.3d 923, 934 (6th Cir. 2004). But at other times, members of our circuit have said the question has been answered, in light of both Supreme Court precedent as well as our own. *See Esch*, 699 F. App'x at 518–19 (McKeague, J., concurring) (recognizing that the Court "has uniformly applied" the Fourteenth Amendment to arrestee and detainee claims for failure to provide medical care and criticizing the majority for raising the issue given that the plaintiff was arrested pursuant to an arrest warrant, which "necessarily issued only after a judicial officer's probable cause determination"); *Smith*, 603 F. App'x at 425 (Batchelder, J., concurring in part and concurring in the result) (noting that it is the Fourteenth Amendment, not the Fourth Amendment, that "requires police officers to provide medical care to individuals in police custody prior to a criminal conviction"). To clear up any lingering uncertainty, we hold that there is no Fourth Amendment right to medical care.

B. We turn to Officers Cook and Wilson's assertion of qualified immunity, measuring that claim against the backdrop of the Fourteenth Amendment. The officers are entitled to summary judgment unless Colson proves both that (1) the officers violated her Fourteenth Amendment right to medical care and (2) the right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We may consider those elements in either order. *Id.* at 236.

Here, we can begin and end with the clearly established prong. *Id.* To show that the officers violated clearly established law, Colson must make one of two showings. One is that

this is an "obvious case" where general "standards can 'clearly establish' the answer, even without a body of relevant case law." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam) (citation omitted); *see also Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam) (holding that a constitutional violation was "obvious" because "no reasonable correctional officer could have concluded that" the officers' behavior was "constitutionally permissible"). Colson, however, does not argue that hers is such a case.

That leaves the second method for showing that the officers violated clearly established law: "identify a case that put [the officers] on notice that [their] specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8. To do so, Colson must define the right with particularity "in light of the specific context of the case, not as a broad general proposition," *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (citation omitted), and then identify "existing precedent" that "placed the . . . constitutional question beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). This demanding standard requires Colson to identify a "case that addresses facts like the ones at issue here." *Rivas-Villegas*, 142 S. Ct. at 8.

Yet rather than trying to clear this high bar, Colson instead attempts to lower it. According to Colson, she is "not required to find a case perfectly aligned with the facts presented" here because her "right to medical care for serious medical needs" is defined with sufficient particularity to be clearly established. But defining a right so broadly does not show that it was clearly established at the time of the purported violation. *See Arrington-Bey*, 858 F.3d at 992–93. And for good reason. Colson's formulation of the right, after all, is merely a restatement of the Fourteenth Amendment right itself, *see Greene v. Crawford County*, 22 F.4th 593, 605 (6th Cir. 2022), which "is far too general a proposition to control this case," *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015) (holding in the Fourth Amendment context that "[q]ualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures"). Indeed, accepting Colson's formulation would "collaps[e] the two qualified-immunity inquiries into one, permitting the constitutional-violation inquiry *always* to answer the clearly established inquiry." *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 508 (6th Cir. 2012). Viewed in the proper light, Colson's definition of the right did not put the officers "on notice that [their] specific

conduct was unlawful," *Rivas-Villegas*, 142 S. Ct. at 8, because it does not address the officers' particular actions or Colson's particular injury, *see Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (recognizing that a right is defined too generally where it "avoids the crucial question whether the official[s] acted reasonably in the particular circumstances that [they] faced").

Nor, it bears adding, is today's case controlled by our decision in *Colson v. City of Alcoa (Colson I)*, No. 20-6084, 2021 WL 3913040 (6th Cir. Sept. 1, 2021). *Colson I*, to be sure, arose out of the same incident. And we affirmed the denial of qualified immunity for a Blount County jail officer who also relied on Russell's medical opinion that Colson's injury did not require medical care. *Id.* at *2–3, *8. *But see id.* at *9–11 (Readler, J., dissenting). As an unpublished decision, *Colson I* does not restrain our evaluation of Colson's claims against the officers. *Sheets v. Moore*, 97 F.3d 164, 167 (6th Cir. 1996). And even if it did, *Colson I* would be a poor guide here. *Colson I*, of course, had not issued at the time of the alleged violation, and thus did not clearly establish the law for today's purposes. *See Brosseau*, 543 U.S. at 200 n.4. And since it was decided, the Supreme Court has twice instructed us that, except for an obvious constitutional violation, we are to grant qualified immunity unless the plaintiff identifies a case with sufficiently similar facts. *See City of Tahlequah v. Bond*, 142 S. Ct. 9, 12 (2021) (per curiam); *Rivas-Villegas*, 142 S. Ct. at 8. Heeding those instructions, we hold that Cook and Wilson are entitled to qualified immunity.

\* \* \* \* \*

For the foregoing reasons, we reverse the judgment of the district court.