NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0684n.06

No. 15-3089

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Oct 08, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| EDWARD SHAVER, Administrator of the Estate of Deceased Mark Shaver, | ) ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| BRIMFIELD TOWNSHIP, et al., | ) | DISTRICT OF OHIO |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: KEITH, ROGERS, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Following his arrest for shoplifting DVDs from a Wal-Mart in Brimfield Township, Ohio, Portage County took Mark Shaver into custody in the early hours of November 2, 2010. During his stay at the Portage County Jail, Shaver, a self-identified daily heroin user, showed several signs of possible opiate withdrawal, including diarrhea, elevated blood pressure and pulse, nausea, sweating, and vomiting. Yet, other than regularly monitoring Shaver's condition, the Jail's correctional officers and privately contracted nurses took no steps to regulate his withdrawal through prescription medication. A little over forty-eight hours after his booking, Shaver collapsed in his cell. He died a day later due to complications from a cerebral aneurysm—an aneurysm, Shaver's Estate contends, that ruptured due to defendants' deliberate indifference to Shaver's serious medical needs because he never saw a physician who could have

prescribed him medications to alleviate his withdrawal symptoms. Shaver's Estate appeals the district court's dismissal of his 42 U.S.C. § 1983 claims against numerous correctional officers, supervisors, nurses, the health care companies providing medical care at the Jail, and Portage County. We affirm.

I.

The facts pertinent to this appeal are limited given a post-appeal settlement between the Estate and the nurses and the health care companies.

Upon his booking at the Portage County Jail and his disclosure that he was a daily heroin user, nurses placed Shaver on withdrawal watch in the early hours of November 2, 2010. Accordingly, the nurses regularly monitored Shaver for various symptoms associated with withdrawal—such as elevated pulse and blood pressure, vomiting, and sweating—pursuant to the health care companies' Clinical Protocols for Opiate Withdrawal/Treatment. If two or more of these symptoms exist, a nurse is to notify the on-call physician. In practice, however, the nurses do not view the presence of two symptoms so rigidly as to mandate contacting the on-call physician without exception. Instead, whether to contact the on-call physician is based on a nurse's individual assessment of an inmate's condition and "depends on the severity of the symptoms." Notification of the on-call physician, moreover, does not automatically trigger the provision of prescription drugs. Rather, the on-call physician must give his or her approval before administering any prescription medication.

Shaver had encounters with six nurses in some fashion at least eight times during his forty-eight-hour detention in the Jail. During these encounters, nurses documented the progression of Shaver's withdrawal symptoms. They noted, for example, that he had diarrhea, nausea/vomiting, and a rising blood pressure and pulse rate. With the exception of LPN David

McCown (who saw Shaver an hour before he collapsed on November 4, 2010), none of the nurses considered Shaver to be in active withdrawal and therefore did not contact the on-call physician under the Protocols. And while McCown circled "in withdrawal" on Shaver's withdrawal watch form, he later testified that he circled "in withdrawal" because he thought it was a "possibility."

Shaver also interacted with Robert Jones, the sole correctional officer remaining in this appeal. On the morning of November 3, Shaver told Jones "that he was feeling either nauseated or . . . wasn't feeling well." Shaver also expressed that he was "having difficulty holding down his food and was having diarrhea." Jones did not personally witness these symptoms. Upon Shaver's inquiry, Jones informed Shaver that a nurse would next make a round (known as the "med pass") between approximately 12:00 and 12:30 p.m. While Jones admits that he does not know "what [he] exactly told the nurse" regarding Shaver's condition, he expressly testified that he passed along Shaver's complaint about having diarrhea to the nurse. Shaver saw a nurse at the next med pass, who documented Shaver as having symptoms of nausea/vomiting, a drop in his pulse, and an increase in blood pressure. The nurse did not document Shaver having diarrhea at this time.

Jones next encountered Shaver in the late morning of November 4. At that time, Jones witnessed Shaver appearing to vomit. Shaver again told Jones that "he wasn't feeling well." The Estate contends that Jones admitted not informing the nurses about this incident, but this is not supported by the record. Instead, Jones testified that he "would have relayed [that Shaver was not feeling well and had nausea and vomiting] to medical." More to the point, Jones clearly testified that he "informed medical when [he] noticed that [Shaver] may have vomited, and medical saw [Shaver] within probably . . . [a] half hour [to] 45 minutes."

Jones found Shaver unresponsive on the floor of his cell later that afternoon, less than an hour after LPN McCown saw Shaver. He died at the hospital the next day due to complications from a ruptured cerebral aneurysm.[1] The aneurysm likely formed due to traumatic events in Shaver's past—being struck by a motor vehicle and a snowboard accident. There is no medical evidence to draw a definitive link between Shaver's nausea, vomiting, and diarrhea and any warning signs of an impending rupture. Nonetheless, the Estate's medical expert has opined that "vomiting, diarrhea and the associated retching with it . . . leads to dissections, tears in the walls of carotid or vertebral arteries"—called "Valsalva effects"—and were therefore "the most probable proximate cause" of Shaver's ruptured aneurysm. He also has concluded that had the Jail's personnel successfully treated Shaver's symptoms, the aneurysm may not have ruptured. At the same time, he also admitted that he would not have expected anyone to know that Shaver had the aneurysm.

Shaver's Estate brought a single § 1983 claim (and several state law claims) against three general categories of defendants: (1) the county operating the Jail (Portage County), its correctional officers (Robert Jones being the only one remaining on appeal), and its supervisors (Sheriff David Doak and Lt. Gregory Johnson); (2) the health care companies providing medical services to the Jail (Correctional HealthCare Companies, Inc. and Health Professionals, Ltd.); and (3) six nurses employed by the health care companies (LPNs Beth Cruise, Tamara Dalesandro, Kelly English, Dawn Hayter, David McCown, and Vondakae

---

[1]While Jones discovered that Shaver collapsed sometime after seeing LPN McCown and participated in attempts to revive him, the Estate makes no deliberate indifference claim regarding the care Shaver received *after* his collapse in this appeal.

Weekly).[2]  The Estate generally asserts that:  (1) the correctional officers and nurses were deliberately indifferent to Shaver's opiate withdrawal condition in violation of the Fourteenth Amendment;[3] (2) the supervisors condoned such unconstitutional conduct by promulgating deficient policies and conducting and approving a deficient post-death investigation; and (3) Portage County and the health care companies maintained unconstitutional policies, customs, or practices under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) for (a) failing to properly treat inmates' withdrawal symptoms, and (b) preventing nurses from communicating about an inmate's medical condition unless the condition raises safety concerns.

The district court, adopting a magistrate judge's Report and Recommendation, entered summary judgment for all defendants on the Estate's § 1983 claim.  It held that even assuming "Shaver's opiate withdrawal is an objectively serious medical condition sufficient to form the foundation for § 1983 liability, none of the actions of any individual defendant . . . constituted deliberate indifference to that condition. . . ."  Because no constitutional violation occurred, the district court held the Estate's *Monell* claims also failed.  Accordingly, the district court granted defendants' motions for summary judgment as to the Estate's § 1983 claim and declined to exercise supplemental jurisdiction over the Estate's state law claims.

During the pendency of this appeal, the parties stipulated to dismiss the health care companies and the nurses with prejudice pursuant to a settlement agreement.  All that remains in

---

[2]As reflected by the caption, the Estate also filed claims against Brimfield Township (as well as its employees) relating to Shaver's arrest.  These claims are not on appeal.

[3]We have not yet resolved whether claims of inadequate medical care by detainees (like Shaver) are instead cognizable under the Fourth Amendment's objective reasonableness standard.  *See Bonner-Turner v. City of Ecorse*, No. 14-2337, 2015 WL 5332465, at *5 n.2 (6th Cir. Sept. 14, 2015) (collecting cases).  Whether the Fourth Amendment applies is not before us as the Estate only brings a deliberate indifference claim under the Fourteenth Amendment.

this appeal, therefore, is whether the district court properly granted summary judgment as to the Estate's claims against Jones, Sheriff Doak, Lt. Johnson, and Portage County.[4]

## II.

We review the district court's grant of summary judgment de novo. *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 526 (6th Cir. 2014). "Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.*

## III.

The Estate's claims against the individual supervisors (Sheriff Doak and Lt. Johnson) and Portage County rise and fall with the viability of its claim against Jones. That is, these claims fail without the presence of an underlying constitutional violation. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation."); *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) ("[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor."). We turn first, and decisively, therefore, to the Estate's claim that Jones was deliberately indifferent to Shaver's serious medical needs.

Under the deliberate indifference rubric, a plaintiff must satisfy both objective and subjective components. *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004). The plaintiff must objectively show that he is "incarcerated under conditions posing a substantial risk

---

[4]To the extent the docket reflects that correctional officers Erica Tate and David Lyons are parties to this appeal, the Estate makes no argument as to these officers. It has therefore abandoned its claims against Tate and Lyons. *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014).

of serious harm" and must subjectively show that the named prison official had "a sufficiently culpable state of mind in denying medical care." *Id.* (citations omitted). "Satisfying the objective component ensures that the alleged deprivation is sufficiently severe, while satisfying the subjective component 'ensures that the defendant prison official acted with a sufficiently culpable state of mind.'" *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013) (citation omitted).

Assuming, as the district court did, that Shaver's condition satisfies the objective prong, we agree the Estate did not meet its burden to satisfy the subjective component of the deliberate indifference test. Under the subjective prong, the Estate must show: (1) "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner"; (2) the official "did in fact draw the inference"; and (3) the official "then disregarded that risk." *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014) (citation omitted). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (internal quotation marks, brackets, and citation omitted). It is not enough, however, for an officer to "fail[] to act in the face of an obvious risk of which he should have known but did not[.]" *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005) (citation omitted). Accordingly, "a prison official may 'not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citation omitted). Nor need a plaintiff "show that the correctional officers acted with the 'very purpose of causing harm or with knowledge that harm will result[.]'" *Phillips v. Roane Cty.*, 534 F.3d 531, 541 (6th Cir. 2008) (citation omitted). Instead, a plaintiff may satisfy

the subjective component through ordinary methods of proof, "including inference from circumstantial evidence[.]" *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

Jones had limited interactions with Shaver. On the morning of November 3, Shaver informed Jones that he was "nauseated," "wasn't feeling well," was "having difficulty holding down his food," and "was having diarrhea." Shaver inquired as to the time of the next med pass, and Jones told him it would occur around 12:00 p.m. or 12:30 p.m. Jones also testified, contrary to the Estate's assertion otherwise, that he passed this information along to the nurses. That one of the now-dismissed nurses failed to document one of the symptoms reported by Jones (diarrhea) is pertinent to that nurse's performance, but not Jones's, and therefore does not create a dispute of material fact as to Jones's subjective knowledge or actions.

Jones also saw Shaver a few hours before he collapsed on November 4. Jones witnessed Shaver appear to vomit, and Shaver told him "he wasn't feeling well." The record also supports, contrary to the Estate's argument, that Jones passed along this information to the nurses.

On this record, we agree with the district court that these actions do not rise to the level of deliberate indifference. There is simply no indication that Jones actually perceived facts from which to infer there was a substantial risk to Shaver, that Jones actually drew that inference, and that Jones then disregarded that risk. *Rouster*, 749 F.3d at 446. Instead, Jones "reasonably responded to [Shaver's] serious medical needs by contacting the nursing staff at the jail for medical assistance." *Harrison v. Ash*, 539 F.3d 510, 519 (6th Cir. 2008) (concluding a correctional officer was not deliberately indifferent when, upon the inmate's complaint, he requested the nurse to "check on" the inmate); *see also Smith v. Cty. of Lenawee*, 505 F. App'x 526, 532 (6th Cir. 2012) (holding a correctional officer was not deliberately indifferent when he, among other things, contacted a doctor regarding an inmate's medical condition and received

assurances regarding the inmate's medical status); *Clark-Murphy v. Foreback*, 439 F.3d 280, 291 (6th Cir. 2006) (finding a correctional officer was not deliberately indifferent when she asked about referring an inmate for a psychiatric evaluation, and then took no further action upon learning one was already completed). We have also noted that the deliberate indifference threshold is higher for correctional officers where, as here, an inmate is receiving medical treatment—there must be some "reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *See Smith*, 505 F. App'x at 532 (citation omitted). The Estate made no such showing here. And to the extent the Estate argues we should infer deliberate indifference because Jones did not expressly log his conversations with Shaver or inform other correctional officers about Shaver's condition, we decline to do so; Jones informed the nurses about his two encounters with Shaver pursuant to Jail policy,[5] and such actions, on their own, do not establish that Jones drew an inference of substantial risk to Shaver, and then disregarded it.

As the Estate has failed to establish an underlying constitutional claim, its claims against Portage County, Sheriff Doak, and Lt. Johnson fail as a matter of law. *Robertson*, 753 F.3d at 622; *McQueen*, 433 F.3d at 470.

Finally, because the district court properly dismissed the Estate's federal claims, it did not abuse its discretion when it declined to exercise jurisdiction over the Estate's state law claims. *See Wee Care Child Ctr., Inc. v. Lumpkin*, 680 F.3d 841, 849 (6th Cir. 2012) ("As [28 U.S.C.] § 1367(c)(3) expressly permits the district court to decline supplemental jurisdiction

---

[5]The Jail's "detoxification services" policy provides that "[s]hould symptoms of withdrawal be present, medical staff shall be notified and shall provide detoxification treatment as indicated according to their established protocol." Additionally, Jail officials are to "promptly relay to the medical staff any immediate emergency need which comes to the[ir] attention. . . ."

in the event, as was the case here, the federal claims are resolved, there was no abuse of discretion.").

## IV.

For these reasons, we affirm.