RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0335p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

RHONDA HEHRER, personal representative of the Estate
of Joseph Hehrer,

                    *Plaintiff-Appellant*,

    *v.*

COUNTY OF CLINTON, MICHIGAN; LAWRENCE JERUE,
Clinton County Sheriff; THOMAS WIRTH, Jail
Administrator; SARAH FAGGION, JAMES BURDICK,
CHAD BASHORE, and RICHARD STOUT, Sergeants;
COREY BECKER, Officer; ADVANCED CORRECTIONAL
HEALTHCARE, INC.; DARYL TYRONE PARKER, M.D.;
WENDY LYNN FREED, LPN; DAWN THELEN, LPN,

                    *Defendants-Appellees*.

> No. 24-2016

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cv-01079—Robert J. Jonker, District Judge.

Decided and Filed:  December 12, 2025

Before:  SUTTON, Chief Judge; MURPHY and BLOOMEKATZ, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Mark Granzotto, Beth A. Wittman, GRANZOTTO & WITTMAN, P.C., Berkley, Michigan, for Appellant.  Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees County of Clinton, Lawrence Jerue, Thomas Wirth, Sarah Faggion, James Burdick, Chad Bashore, Richard Stout, and Corey Becker.  Devlin K. Scarber, CHAPMAN LAW GROUP, Troy, Michigan, for Appellees Advanced Correctional Healthcare, Inc., Daryl Parker, Wendy Freed, and Dawn Thelen.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.   This case's tragic facts took place during Joseph Hehrer's detention at a county jail.   After Hehrer showed signs of illness (including vomiting), medical staff repeatedly evaluated him.   Yet they failed to uncover that he suffered from a previously undiagnosed condition: diabetes.   Four days after Hehrer's first request for medical care, his health worsened.   Paramedics rushed him to a hospital, and he died days later.   Hehrer's estate brought federal claims against the county and its officials and state-law claims against the medical provider and its personnel.   As relevant now, the estate asserted that several corrections officers acted with deliberate indifference to Hehrer's medical needs and that the county failed to adequately train them.   But we agree with the district court that the officers reasonably deferred to the medical professionals.   The court thus correctly granted summary judgment to the county and its officials and reasonably refused to exercise supplemental jurisdiction over the state-law claims.   We affirm.

I

On January 18, 2019, Hehrer got into a car accident in Clinton County, Michigan. Officers subsequently charged him with operating the vehicle while under the influence of heroin and with a probation violation for an earlier conviction.   Hehrer lacked the ability to post bond.

Five days later, he began to serve time on these charges in the Clinton County Jail. While booking Hehrer into the jail, a screening officer completed a medical-history report about his health.   The report stated that Hehrer denied having any medical conditions, including diabetes.   It also suggested that he showed no signs of any health problems.

Clinton County had contracted with Advanced Correctional Healthcare (which goes by "ACH") to provide medical care to inmates.   ACH agreed to have a nurse on site at the jail for 56 hours each week, to have a physician or mid-level practitioner visit the jail once per week, and to have a physician on call at all times.   ACH also agreed to provide health evaluations to inmates.

In early February, ACH nurse Wendy Freed evaluated Hehrer.  He again confirmed that he did not have diabetes or any other medical conditions apart from a concussion caused by the car accident.  He also appeared healthy, weighing in at 128 pounds.  For the rest of the month, Hehrer continued to look normal to his family during their weekly visits.

In early March, though, Hehrer took a turn for the worse.  His mother recalled that "he wasn't feeling well" based on a phone conversation they had on March 2.  Hehrer Dep., R.130-38, PageID 10161.  His condition continued to deteriorate over the next few days.  This case turns on the events that occurred between March 5 and March 9.

*March 5*.  Hehrer submitted his first sick-call request on March 5.  He reported having a fever and suffering from queasiness, headaches, and heartburn.  He added that he had "[p]uked a couple times."  Req., R.130-16, PageID 10034.  Sarah Faggion, a corrections sergeant, worked the overnight shift from 6:00 p.m. to 6:00 a.m. between March 5 and 6.  After she learned of Hehrer's request, she ordered him out of the general dorm and into medical observation.  The jail has no infirmary, so inmates who require medical observation stay in a receiving cell in the booking area.  The prison staffs this area around the clock.

*March 6*.  An unknown officer implemented Sergeant Faggion's order by taking Hehrer to the booking area around 12:35 a.m. on March 6.  The officer placed Hehrer in a receiving cell with windows across from the staffed "booking cage."  Officers thus could monitor him from there.

Sergeant Chad Bashore took over for Faggion at 6:00 a.m.  A few hours later, Nurse Freed evaluated Hehrer.  According to Freed's records, Hehrer told her that he had not "been able to hold things down since" March 2 but that he had not vomited again since 11:00 p.m. the night before.  Note, R.118-19, PageID 2322.  Hehrer described his "appetite" as "good," said that he felt no pain when going to the bathroom, and opined that he was "not that sick" and "just wanted to sleep a lot[.]"  *Id.*  Hehrer asked to return to the general dorm with the other inmates.  But Freed called Daryl Parker, an ACH doctor, who told her to keep him in medical observation.  Parker suggested that he would examine Hehrer on the "next clinic day" and prescribed Zofran for the nausea in the meantime.  *Id.*

At 6:00 p.m. that evening, Sergeant Richard Stout took over for Bashore on the night shift. Two hours later, Dr. Parker visited the jail and evaluated Hehrer. Hehrer told Parker that he had been sick but felt "better" and had been "keeping down his meals." Parker Dep., R.118-4, PageID 1919. After examining Hehrer, Parker concluded that he had "[n]o apparent disease" and "look[ed] good[.]" *Id.* That said, Hehrer had lost fourteen pounds since Freed's evaluation in February, so Parker told staff to "[c]ontinue to monitor [his] weight." *Id.* Parker otherwise cleared Hehrer to "return to [his] dorm." *Id.*; Note, R.118-19, PageID 2323.

*March 7*. Although Hehrer did not request medical aid or speak to officers during most of March 7, he looked sick to other inmates. He slept in his bunk for most of the day but got up for breakfast and lunch. At dinnertime, another inmate brought a dinner tray to Hehrer.

Around 6:30 p.m., surveillance video shows that an inmate approached an officer who had entered the dorm and gestured toward Hehrer in apparent concern. The officer spoke briefly to Hehrer but then walked out of the dorm. Prison records suggest that Hehrer told the officer that he had "been throwing up" but that "he did not want to go up front" to the booking area. Rep., R.118-33, PageID 2411. Hehrer went back to bed.

Less than two hours later, Hehrer got out of bed to pick up a trashcan, presumably to vomit. He then walked out of the dorm to speak to an officer at the control center. He told the officer that "his kidneys hurt, it hurt to pee, he was having stabbing pain and that he couldn't keep down any food or water." *Id.* The officer escorted Hehrer to the booking area for observation. Officers also measured his vital signs.

Sergeant Stout was working another night shift. He did not know of any "protocol" for Hehrer's predicament, so he called the on-call ACH medical provider. *Id.* Stout told this provider about Hehrer's symptoms and vitals. The provider responded that Stout should give Hehrer more Zofran, instruct Hehrer to drink plenty of water, and monitor his condition.

*March 8*. Hehrer remained sick on March 8. At 7:00 a.m., he left his receiving cell to take a breakfast tray. A short time later, video surveillance suggests that he crawled toward something in the cell to vomit. Around 9:30 a.m., Nurse Freed evaluated him. Although Hehrer had an elevated heart rate, he had a normal blood pressure and no fever. He told Freed that he

had been "throwing up blood" and that blood was "in the drain." Note, R.118-20, PageID 2325. But Freed saw no blood in the drain and did not witness any vomiting. She contacted Dr. Parker. The doctor prescribed Zofran and Prilosec and instructed Freed to order lab tests.

During the rest of the day, Hehrer got up several times to obtain meals or shower. But video surveillance suggests that he continued to vomit. Nurse Freed and other officers periodically checked on Hehrer. In a note from around 2:00 p.m., Freed recorded that Hehrer told her that he refused to eat breakfast and lunch because he did not "like the food," but he said that he was "ok" and wanted to return to the general dorm. Note, R.118-20, PageID 2326. Freed responded that Dr. Parker wanted him to remain in medical observation. At some point on March 8, Hehrer received a cellmate. This cellmate witnessed Hehrer vomit blood and alerted officers that he needed medical attention. But the cellmate says the officers ignored him. In total, the video suggests that Hehrer "had contact with a nurse for less than 10 minutes" from the evening of March 7 until about 6:00 p.m. on March 8. Adams Rep., R.130-13, PageID 10017.

*March 9.* Hehrer remained sick in the early morning hours of March 9. He may have vomited in his receiving cell a few more times in the overnight hours. But Hehrer received no medical attention during this time.

At 6:00 a.m., Sergeant James Burdick and Officer Corey Becker began their shifts. Burdick spoke to Hehrer "multiple times" that morning. Burdick Aff., R.118-31, PageID 2398. Hehrer "didn't look healthy" because he was "very skinny." Burdick Dep., R.130-7, PageID 9867. When Hehrer received a breakfast tray around 6:30 a.m., Burdick pushed Hehrer to eat something. Hehrer claimed to have "nibbled off a little bit of his toast" and "had a little bit of milk" but left most of the food on the tray. *Id.*, PageID 9854. Burdick conveyed this information to Dawn Thelen, another ACH nurse.

Around 8:50 a.m., Thelen brought Hehrer his medication and examined him. Thelen also thought that Hehrer looked sick, and he could not "take his meds on his own." Thelen Dep., R.130-46, PageID 10238. She helped Hehrer with his medications and then obtained a scale to record his weight. But he was too weak to stand. At that point, Thelen notified Burdick that Hehrer should go to the hospital. Burdick began the necessary process for him to leave.

When Thelen first informed Burdick that Hehrer needed outside medical care, Hehrer looked "stable." *Id.*, PageID 10250. But things "quickly changed." *Id.* Hehrer began to vomit up his medications and what appeared to be blood. And his skin became "cool" and turned a "yellowish kind of tint." *Id.*, PageID 10239. These signs led Thelen to believe that Hehrer needed immediate medical attention. Burdick thus directed Becker to call 911.

Paramedics soon arrived. They escorted a semiconscious Hehrer out on a stretcher. According to a paramedic, Hehrer "was a very sick patient" because "multiple systems within [his] body" were failing. Acre Dep., R.130-35, PageID 10082–83. He was suffering from cardiogenic shock (failure of the heart to pump blood properly), low blood pressure, high blood sugar, weakness, and hypovolemic shock (low blood volume). Paramedics sped to the hospital and provided advanced life support on the way. Hehrer weighed 110 pounds—18 pounds less than what he weighed in February.

Despite the hospital's care, Hehrer died four days later from "[m]ultisystem organ dysfunction" caused by "[d]iabetic ketoacidosis." Death Certificate, R.130-37, PageID 10141. This condition (often associated with diabetes) occurs when a person's blood sugar gets too high. It typically develops within "three or four hours." Schnall Dep., R.118-26, PageID 2347. Hehrer was 26 years old.

Hehrer's mother brought this suit as the representative of his estate. (To distinguish Hehrer from his mother, we will refer to the plaintiff as his "Estate.") The Estate alleged two federal claims under 42 U.S.C. § 1983 against what we will call the "County Defendants": Clinton County, Sheriff Lawrence Jerue, Jail Administrator Thomas Wirth, Sergeants Faggion, Burdick, Bashore, and Stout, and Officer Becker. It claimed that Faggion, Burdick, Bashore, Stout, and Becker (collectively, "the Officers") violated due process by acting with deliberate indifference to Hehrer's medical needs. The Estate next brought a claim against Clinton County, Sheriff Jerue, and Administrator Wirth under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Lastly, the Estate alleged state-law claims against ACH and its medical professionals.

The County Defendants moved for summary judgment.  A magistrate judge recommended that the district court grant their motion. *See Hehrer v. Clinton County*, 2024 WL 4713082, at *13 (W.D. Mich. July 23, 2024).  The judge concluded that the Officers had forfeited any qualified-immunity defense. *See id.* at *10.  Still, the judge believed that the Estate failed to establish a deliberate-indifference claim against the Officers on the merits. *See id.* at *6–10.  The judge next rejected the *Monell* claim against Clinton County, Jerue, and Wirth. *See id.* at *10–12.

Accepting these recommendations, the district court granted summary judgment to the County Defendants on the federal claims. *See Hehrer v. Clinton County*, 2024 WL 4532922, at *2 (W.D. Mich. Oct. 21, 2024).  The court also declined to exercise supplemental jurisdiction over the state-law claims against ACH and its professionals. *See id.* at *3.  It thus entered a final judgment.  The Estate appealed.  We review the district court's grant of summary judgment de novo and must resolve "all genuine factual disputes in the light most favorable to" the Estate when doing so. *Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 925 (6th Cir. 2024).

II

The Estate appeals the district court's decision on three grounds.  It argues that a reasonable jury could find that the Officers acted with deliberate indifference to Hehrer's medical needs.  It argues that a reasonable jury could find Clinton County liable under *Monell*.  And it argues that the district court should not have dismissed its state-law claims.

A.  Deliberate-Indifference Claim

The Estate first asserts that it offered enough evidence to survive summary judgment on its deliberate-indifference claim against the Officers.  It is mistaken.

1.  Background Law

We start by clarifying two points about this claim.  Point One: A plaintiff generally must prove two things to overcome an officer's qualified-immunity defense. *See District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018).  The plaintiff must show *first* that the officer violated the Constitution and *second* that the governing legal principles clearly established this violation at

the time of the officer's actions.  *See id.*  In this case, though, the magistrate judge found that the Officers forfeited the second (clearly established) part of this test.  *See Hehrer*, 2024 WL 4713082, at *10.  Although the Officers challenge this finding on appeal, we need not get into that debate.  We will assume that the Estate must establish only a constitutional violation in this appeal.

Point Two: For the first qualified-immunity step, we still must identify the constitutional right underlying the Estate's deliberate-indifference claim.  While the Eighth Amendment's ban on "cruel and unusual punishments" protects convicted prisoners, the Fourteenth Amendment's ban on "depriv[ations]" of "life" or "liberty" "without due process of law" protects pretrial detainees.  U.S. Const. amends. VIII, XIV, § 1; *see Lawler*, 93 F.4th at 926.  Should we treat Hehrer as a pretrial detainee (protected by the Fourteenth Amendment) or a convicted prisoner (protected by the Eighth Amendment)?  Clinton County held him on charges that he operated his vehicle while under the influence of heroin and violated the terms of his probation for an earlier conviction.  He qualified as a pretrial detainee for the former charge.  And no party argues that we should treat him as a convicted prisoner for the latter one.  *But see Peterson v. Heinen*, 89 F.4th 628, 634–35 (8th Cir. 2023).  We thus will treat Hehrer as a pretrial detainee in this appeal.

At one time, the distinction between pretrial detainees and convicted prisoners did not matter.  When both sets of inmates alleged that corrections officers had acted with deliberate indifference to their health, we required them to satisfy the same objective and subjective elements from *Farmer v. Brennan*, 511 U.S. 825 (1994).  *See Lawler*, 93 F.4th at 926–27.  Objectively, they had to establish that they had "serious medical needs."  *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  Subjectively, they had to establish that a defendant knew of the substantial risk of serious harm that arose from their serious medical needs.  *See Lawler*, 93 F.4th at 926–27.  And they had to show that the defendant did not "respond[] reasonably to the risk" upon learning of it.  *Farmer*, 511 U.S. at 844.

That said, we adopted an easier-to-meet subjective element for pretrial detainees under the Fourteenth Amendment in *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021).  *See Helphenstine v. Lewis County*, 60 F.4th 305, 315–17 (6th Cir. 2023).  *Brawner* suggested that

officers may face liability to pretrial detainees if they "*recklessly disregarded* a risk so obvious that they either knew or should have known of it." *Lawler*, 93 F.4th at 927 (citing *Helphenstine*, 60 F.4th at 317). Under this view, the Estate did not need to establish that the Officers subjectively knew of any substantial risk of serious harm to Hehrer. *See id.*

The Officers respond that the Eighth Amendment's more demanding subjective test should apply because their conduct occurred in 2019—two years before *Brawner*'s change in 2021. The Officers would have raised a valid point if they had preserved any claim (under step two of the qualified-immunity test) that they did not violate clearly established law. *See Lawler*, 93 F.4th at 927–28. As we have noted, however, the magistrate judge found that their inadequate briefing forfeited such a claim. And the Officers wrongly seek to incorporate *Lawler*'s reasoning into qualified immunity's first step. At that step, we must consider whether a plaintiff even made out a constitutional violation at all. *See Wesby*, 583 U.S. at 62–63. When undertaking that inquiry, we rely on the new standards that govern today—not on the clearly established standards that governed back in 2019. *See Gibson v. Abate*, 2025 WL 1913247, at *3 (6th Cir. July 11, 2025).

## 2. Application

Under these standards, the Estate has not introduced enough evidence to create a jury issue on its deliberate-indifference claim. To be sure, it may well have met the objective element. We have held that prisoners can establish that they have serious medical needs if "a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004) (citation omitted). And we have added that an inmate's condition meets this test when the inmate vomited and suffered from "'sharp' and 'severe' stomach pains" over several days. *Id.* at 899; *see Grote v. Kenton County*, 85 F.4th 397, 407–08 (6th Cir. 2023). Hehrer reported similar symptoms leading up to his death, including vomiting blood, nausea, and pain.

But the Estate's claim stumbles at the subjective element. It had to show that the Officers acted "recklessly 'in the face of an unjustifiably high risk of harm'" that they knew of or should have known of. *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836). We have said that

this test requires more than mere negligence. *See id.* In what way? According to common-law sources, the difference turns on the size of the risk of harm. For recklessness, the risk must be "substantially greater than that which is necessary to make [a defendant's] conduct negligent." Restatement (Second) of Torts § 500 (A.L.I. 1965); *see Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68–69 (2007). That is, the "difference" in the risk must be "so marked as to amount substantially to a difference in kind" rather than degree. Restatement (Second) of Torts § 500 cmt. g. Put differently, it must be "highly probable" that the risk would materialize and cause harm. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 34, at 213 (5th ed. 1984).

Even if this large risk exists, the Estate also had to show that the Officers "responded unreasonably" to the risk. *Campbell v. Riahi*, 109 F.4th 854, 860 (6th Cir. 2024). How should corrections officers respond to an inmate's medical concerns? They lack medical expertise. So they typically act reasonably by referring an inmate's health concerns to medical personnel. *See Mercer v. Athens County*, 72 F.4th 152, 162–63 (6th Cir. 2023); *Shaver v. Brimfield Township*, 628 F. App'x 378, 383 (6th Cir. 2015); *Smith v. County of Lenawee*, 505 F. App'x 526, 533–34 (6th Cir. 2012). Likewise, once inmates begin to receive care from a medical professional, officers typically act reasonably by following the "medical professional's diagnosis or treatment." *Grote*, 85 F.4th at 412; *see McGaw v. Sevier County*, 715 F. App'x 495, 497–99 (6th Cir. 2017); *see also Graham v. County of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004). A contrary rule would adopt the (potentially dangerous) proposition that lay staff have a duty to veto medical decisions from trained professionals. *See McGaw*, 715 F. App'x at 498.

Yet deference to medical judgments has its limits. An officer might act recklessly, for example, if the officer does not seek medical help after an inmate suffers from "new and alarming symptoms" since last seeing a medical professional. *Stojcevski v. Macomb County*, 827 F. App'x 515, 522 (6th Cir. 2020) (quoting *Barberick v. Hilmer*, 727 F. App'x 160, 163–64 (6th Cir. 2018) (per curiam)); *see, e.g.*, *Greene v. Crawford County*, 22 F.4th 593, 608–09 (6th Cir. 2022); *Smith*, 505 F. App'x at 535. Or an officer might act recklessly if the officer defers to an unethical healthcare worker that the officer knows mistreats inmates. *See Smith*, 505 F. App'x at 532. And, of course, an officer might act recklessly if the officer fails to implement a medical

professional's own instructions.  *See Howell v. NaphCare, Inc.*, 67 F.4th 302, 316 (6th Cir. 2023).

Here, the Estate sued five named officers: Bashore, Stout, Faggion, Burdick, and Becker. Each officer worked various shifts during Hehrer's final days from March 5 to March 9, 2019. The Estate may not impose liability on these officers for their coworkers' acts, so it must satisfy the deliberate-indifference test for each officer.  *See Greene*, 22 F.4th at 607; *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020).  We will consider them in turn.

*Bashore*.  Sergeant Bashore worked the 6:00 a.m. to 6:00 p.m. shifts on March 6 and March 7.  Nurse Freed evaluated Hehrer a few hours after Bashore started the first of these shifts. At that time, Hehrer did not seem seriously ill: he told Freed that his "appetite" was "good," that he was "not that sick" or in pain, and that he would like to return to the general dorm with the other inmates.  Note, R.118-19, PageID 2322.  Freed nevertheless called Dr. Parker, who instructed her to keep Hehrer in medical observation and prescribed an anti-nausea drug.  The Estate points to nothing that would allow a reasonable jury to find that Bashore should have overridden these medical treatments from professionals.  *See McGaw*, 715 F. App'x at 498.

Turning to the second of Bashore's shifts on March 7, Hehrer remained in the general dorm the entire time.  Hehrer looked sick to other inmates.  But neither Hehrer nor those inmates expressed any concern to officers about his condition until after Bashore had left for the day at 6:00 p.m.  Rather, Bashore knew only that Dr. Parker had cleared Hehrer to return to the general dorm the night before.  Without other information, he could reasonably rely on this medical decision. *See id.*

*Stout*.  Sergeant Stout worked two overnight shifts starting at 6:00 p.m. on March 6 and March 7.  He relied on medical staff both nights.  On the night of March 6, Dr. Parker examined Hehrer shortly after Stout began his shift.  Hehrer told Parker that he felt "better" and had stopped vomiting.  Parker Dep., R.118-4, PageID 1919.  Parker also concluded that Hehrer "look[ed] good," allowed him to return to the general population, and instructed staff only that they should continue to monitor Hehrer's weight.  *Id.*  The Estate points to no evidence that

Hehrer had any medical issues for the rest of Stout's shift that night.  Here too, then, Stout could "reasonably defer" to Parker's judgment.  *Grote*, 85 F.4th at 413.

On the night of March 7, Hehrer's condition deteriorated.  He thus sought medical care again.  Hehrer told officers that "his kidneys hurt, it hurt to pee, he was having stabbing pain and that he couldn't keep down any food or water."  Rep., R.118-33, PageID 2411.  Stout placed him back in medical observation and had other officers check his vitals.  Stout then called the on-call medical provider, who said to give Hehrer more anti-nausea medication, monitor him, and tell him to drink water.  Stout implemented these instructions.  *See Shaver*, 628 F. App'x at 383.  And no evidence suggests that Hehrer's symptoms worsened over the rest of Stout's shift such that he should have sought input from medical staff a second time.  *See Stojcevski*, 827 F. App'x at 522.

*Faggion*.  Sergeant Faggion likewise worked two overnight shifts starting at 6:00 p.m. on March 5 and March 8.  On her first shift, Hehrer submitted a sick-call request.  Faggion ensured that other officers moved Hehrer into observation that night.  Although she did not seek *immediate* medical assistance for Hehrer during the overnight hours, his condition did not require her to do more.  He had suggested that he had "[p]uked a couple times" and had a fever, queasiness, and headaches.  Request, R.130-16, PageID 10034.  When arriving at the prison, he had also told a screening officer that he did not suffer from any chronic conditions, including diabetes.  These facts thus made it seem like he had a typical stomach flu.  They do not create the "high risk of harm" required for the Estate to show that Faggion acted recklessly by waiting for a nurse to see Hehrer in the morning.  *Safeco*, 551 U.S. at 68 (quoting *Farmer*, 511 U.S. at 836).

On Faggion's second overnight shift starting on March 8, she relied on the treatment instructions from the medical staff.  Admittedly, video surveillance suggests that Hehrer continued to vomit in the overnight hours.  But this evidence does not reveal "new and alarming symptoms"; rather, it shows symptoms on par with those in the last 24 hours.  *Barberick*, 727 F. App'x at 164.  Indeed, Hehrer had told Nurse Freed that morning that he had been "throwing up blood."  Note, R.118-20, PageID 2325.  But Dr. Parker did not see any urgency in that claim and continued to prescribe only Zofran and Prilosec for him.  Despite Hehrer's consistent

vomiting, then, the medical staff never shared any concern that he needed intensive care. Faggion thus had no basis to think otherwise.

*Burdick and Becker*.   Sergeant Burdick and Officer Becker worked day shifts from 6:00 a.m. to 6:00 p.m. on March 8, and they both started working at 6:00 a.m. on March 9—a few hours before they called an ambulance for Hehrer.   Like the other officers, they too reasonably deferred to medical judgments about Hehrer's condition.   *See McGaw*, 715 F. App'x at 498.   On March 8, Nurse Freed saw Hehrer in the morning and chose to adhere to the same medical treatment after speaking with Dr. Parker.   Note, R.118-20, PageID 2325.   Freed also monitored him during the rest of the afternoon.   And for his part, Becker did not even work in the booking area that day, so he bore no responsibility to monitor Hehrer.

On March 9, Nurse Thelen arrived at the jail no later than 6:45 a.m.   Before Thelen examined Hehrer at around 8:50 a.m., Burdick had already spoken to Hehrer "multiple times" and conveyed what he had learned about Hehrer's condition to Thelen.   Burdick Aff., R.118-31, PageID 2398.   Becker, by comparison, never observed Hehrer vomiting or "appearing to be in any kind of distress, or in any need of immediate medical attention."   Becker Aff., R.118-34, PageID 2414.   And once Thelen decided that Hehrer needed emergency aid, Burdick immediately implemented her instruction by directing Becker to call 911.   By doing so, Burdick bypassed the jail's standard protocol for non-emergency situations because he did not alert the administrator before making this call.

In sum, this case resembles others in which we have held that corrections officers could "reasonably defer" to the medical staff who were treating an inmate.   *Grote*, 85 F.4th at 412; *see Mercer*, 72 F.4th at 162–63; *Shaver*, 628 F. App'x at 383; *Smith*, 505 F. App'x at 533–34.

The cases on which the Estate relies, by contrast, do not look anything like this one. Take *Greene*.   There, an inmate began to experience delirium tremens (confusion and hallucinations) from alcohol withdrawal.   *See Greene*, 22 F.4th at 599–603.   But officers did not seek medical care and instead had the inmate see a mental-health counselor.   *Id.* at 602–03.   The inmate died after going without any medical attention for some four days.   *Id.* at 603–04.   We held that a jury could find that the officers acted with deliberate indifference because they "failed

to seek any basic medical assistance" for the inmate. *Id.* at 609; *see also Helphenstine*, 60 F.4th at 317–20. The Officers in this case acted far differently. While the officers in *Greene* did not obtain any medical care for the inmate, the Officers here ensured that a doctor and nurses repeatedly treated Hehrer.

Or take *Howell*. There, an inmate died of a sickle-cell crisis after medical staff ordered corrections officers to place him in a restraint chair rather than take him to the hospital. *See Howell*, 67 F.4th at 309. An officer argued that he reasonably deferred to the medical staff's recommendation to keep the inmate at the jail. *See id.* at 316. But we found that a jury could find that he acted with deliberate indifference. *See id.* We reasoned that medical staff had told officers to check on the inmate "every ten minutes as required by policy" and to notify them of "anything unusual." *Id.* Yet the officer failed to complete timely checks and conducted those checks in a cursory manner. *See id.* Here, by contrast, the Officers complied with the medical staff's instructions and with the jail's policies when they monitored Hehrer.

Lastly take *Smith*. Like the inmate in *Greene*, the inmate in *Smith* died from delirium tremens caused by alcohol withdrawal. 505 F. App'x at 529. An officer watching the inmate called a doctor about her hallucinations. *Id.* at 530. The doctor told the officer that "she's on good medicine" and that isolation would "do her some good." *Id.* But she died the next morning. *See id.* We granted qualified immunity to several officers, including the officer who called the doctor. *See id.* at 533–34, 536. But we denied that immunity to two officers who failed to monitor the inmate in her final hours while her condition worsened. *See id.* at 535–37. Sergeant Burdick and Officer Becker did not make the same mistake. Indeed, Burdick spoke with Hehrer several times in his last couple of hours at the jail. More importantly, while no medical staff treated the inmate in *Smith*, Burdick and Becker relied on Nurse Thelen for Hehrer's medical needs on March 9.

## B. *Monell* Claim

The Estate next challenges the dismissal of its *Monell* claim against Clinton County. (It also brought this claim against Sheriff Jerue and Administrator Wirth, but its suit against these officers in their official capacities duplicates the one against Clinton County. *See Kentucky*

*v. Graham*, 473 U.S. 159, 165–66 (1985).)  Under *Monell*, a § 1983 plaintiff may not hold a municipality vicariously liable for the unconstitutional actions of its officers.  *See* 436 U.S. at 691.  Rather, the plaintiff must tie unconstitutional conduct to a municipal policy or custom.  *See Gambrel v. Knox County*, 25 F.4th 391, 408 (6th Cir. 2022).  The plaintiff may establish such a policy or custom in different ways.  *See id.*  Here, the Estate has picked a "failure-to-train" theory, suggesting that Clinton County did not adequately train its corrections officers about the proper ways to medically observe sick inmates when medical staff were not at the jail.

To ensure that this failure-to-train theory does not result in vicarious liability, the Supreme Court's cases require the Estate to prove "two demanding elements."  *Id.*; *see Connick v. Thompson*, 563 U.S. 51, 61–62 (2011).  County officials must have acted with "deliberate indifference" to whether their inadequate training could cause employees to violate a person's constitutional rights.  *Connick*, 563 U.S. at 61 (citation omitted).  And this improper training must have "actually caused" those constitutional violations.  *Id.* at 70; *see Gambrel*, 25 F.4th at 408–09.

We need only consider the deliberate-indifference element.  Under this "stringent standard of fault," county officials must have "disregarded a known or obvious consequence of" their failure to train.  *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).  In most cases, this test requires a plaintiff to show that a county's employees had engaged in a "pattern of similar constitutional violations" before the violation at issue in a case.  *Connick*, 563 U.S. at 62.  Only in "rare" circumstances when the need for training is "patently obvious" will a single constitutional violation suffice to establish that a county acted with deliberate indifference.  *Id.* at 64.

Even if we assume that the Estate showed that Clinton County did not adequately train its officers, it has not established that the County acted with deliberate indifference.  The Estate does not even try to prove a "pattern" of unconstitutional medical care.  *Id.* at 62.  It points to no incidents other than this one.  *See Winkler v. Madison County*, 893 F.3d 877, 903 (6th Cir. 2018).  Rather, the Estate relies on a "single-incident" theory of liability.  *Connick*, 563 U.S. at 63.  According to the Estate, it should have been obvious to county officials that corrections officers

would act with deliberate indifference to an inmate's medical needs if they did not receive training about the proper procedures to follow when medical staff were not on site.

We disagree. This case is not a "rare" one in which the Estate may rely on the treatment of Hehrer alone. *Id.* at 64. Indeed, the Estate does not identify any specific "medical training" that the staff should have received but did not. *Winkler*, 893 F.3d at 903. The County's contract with ACH also required this entity always to have a medical professional on call to take concerns about sick inmates. *Cf. id.* In fact, Sergeant Stout relied on this policy to call a physician's assistant when Hehrer requested medical aid on the night of March 7. And we have recognized that municipalities do not act with deliberate indifference when they care for inmates by relying on the medical judgment of professionals. *See Graham*, 358 F.3d at 384. That rule applies here.

In response, the Estate invokes *Helphenstine*. True, that decision held that a reasonable jury could find that a county's policy of asking corrections officers to determine "what constituted a medical emergency" amounted to "deliberate indifference to inmate health and safety." 60 F.4th at 325. Yet the jail's contract with its medical provider required him to visit the jail only once per week. *See id.* And he did not even have the "experience" to treat inmates going through withdrawal from drugs or alcohol. *Id.* For the most part, then, the county left untrained officers to fend for themselves during medical emergencies. *See id.* So *Helphenstine* distinguished its facts from our contrary decision in *Winkler* because the jail in *Winkler* regularly had medical staff on site and always had that staff on call. *See id.* at 324. Like the county in *Winkler*, Clinton County staffed nurses at its jail for 56 hours each week, a doctor visited once a week, and medical professionals were always on call. This case thus resembles *Winkler*, not *Helphenstine*.

## C. State-Law Claims

The Estate lastly challenges the district court's refusal to exercise supplemental jurisdiction over its state-law claims against ACH and its medical professionals. Yet our caselaw requires district courts to presume that they should decline this jurisdiction if they have rejected all the federal claims before trial. *See Cotterman v. City of Cincinnati*, 2023 WL 7132017, at *7 (6th Cir. Oct. 30, 2023) (collecting cases); *see, e.g.*, *Kowall v. Benson*, 18 F.4th 542, 549 (6th

Cir. 2021); *Bishop v. Child.'s Ctr. for Dev'l Enrichment*, 618 F.3d 533, 538–39 (6th Cir. 2010). And here, the Estate points to nothing that would overcome this starting presumption. Indeed, the Estate's argument that the district court wrongly dismissed these state-law claims depends on its view that the court also wrongly granted summary judgment on its federal claims. But the Estate is mistaken about the federal claims. So the district court did not abuse its discretion in dismissing the state-law claims. *See Cotterman*, 2023 WL 7132017, at \*6.

We affirm.